IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| SOUTH CAROLINA COASTAL CONSERVATION LEAGUE, | ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, CHARLESTON DISTRICT; LTC JEFFREY S. PALAZZINI, in his official capacity as Commander of the Charleston District; LTG TODD T. SEMONITE, in his official capacity as Chief of Engineers; MARK T. ESPER, in his official capacity as the Secretary of the U.S. Army; UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION; DR. WALTER C. WAIDELICH, JR., in his official capacity as Executive Director of the Federal Highway Administration; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; E. SCOTT PRUITT, in his official capacity as Administrator of the U.S. EPA, SOUTH CAROLINA DEPARTMENT OF TRANSPORTATION; CHRISTY HALL, in her official capacity as South Carolina Secretary of Transportation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT**<br><br>C.A. No. <u>2:17-cv-03412</u>-PMD |
| Defendants. | ) ) ) | |

## INTRODUCTION

1.     This action challenges the unlawful approval of federal permits for construction of the South Carolina Department of Transportation's ("SCDOT") planned Interstate 73 ("I-73") project in South Carolina, a proposed new interstate to Myrtle Beach that would cost up to $3.8

billion dollars to construct and unnecessarily destroy hundreds of acres of pristine freshwater wetlands, despite the existence of viable, cheaper, and environmentally-preferable alternatives to this new roadway.

2.      The challenged authorizations issued by the U.S. Army Corps of Engineers and various Corps officials (collectively hereinafter "the Corps") allow SCDOT to fill, clear, and otherwise permanently degrade hundreds of acres of wetlands, streams, and other waters of the United States. The Corps' permits were issued without independent assessment of the purpose and need for this massive interstate, and without adequate consideration of practicable alternatives or ways to avoid and minimize the environmental impacts of I-73. Similarly, in conducting its environmental analysis of this project, the Federal Highway Administration and its officials (collectively hereinafter, "FHWA") relied on an outdated and unreasonably narrow conception of the purpose and need for I-73, ignored all non-interstate alternatives to I-73, and failed to consider significant changes over the past decade that have undermined the rationale for the interstate project. As one central example, most other states who once planned portions of I-73 within their borders have abandoned plans to construct new interstate segments. Yet the agencies failed to consider this fact, instead continuing to rely on the necessity of I-73 in South Carolina as part of a fictitious national interstate linkage.

3.      Both the Corps and FHWA also improperly relied on a decade-old environmental analysis for this project despite significant changes in circumstances, impacts, and other factors that have occurred since that analysis was completed in 2008. For example, the project will now cost as much as $2 billion more than originally predicted and is almost certain to require tolling. As the agencies have acknowledged, tolling will require additional study and environmental review that has not yet been completed. Projections for heavy truck volumes have also now

quadrupled from the original estimates, leading to significantly increased noise, air quality, and other impacts not fully considered in the agencies' environmental review. Yet both agencies have refused to prepare a Supplemental Environmental Impact Statement ("SEIS") as required by federal law, instead relying on far less searching "Reevaluations" that arbitrarily conclude that no significant changes have occurred. The use of Reevaluations, as opposed to a SEIS, also prevented the public from providing any input regarding the numerous changes that have occurred over the past decade, including the extra $2 billion in costs.

4.      Plaintiff South Carolina Coastal Conservation League ("Conservation League") seeks a declaration that the decisions by the Corps and U.S. Environmental Protection Agency and its officials (collectively hereinafter, "EPA") to prepare only an Environmental Assessment ("EA") and approve the Record of Decision ("ROD") for this project were unlawful, arbitrary, and capricious in violation of the Administrative Procedures Act ("APA") and National Environmental Policy Act ("NEPA"). The Conservation League also seeks a declaration that the Corps' and EPA's decisions to approve the Section 404 Permit were arbitrary, capricious, and in violation of the Clean Water Act ("CWA"). As to Defendant FHWA, the Conservation League seeks a declaration that FHWA has violated NEPA, the APA, and Section 4(f) of the Department of Transportation Act of 1966 in approving the 2017 Reevaluations for I-73 and in failing to prepare a SEIS and new Section 4(f) evaluation.

5.      The Conservation League asks this Court to vacate (1) the Corps' Section 404 permit and associated ROD, (2) the Corps' EA, and (4) FHWA's  Reevaluations, and to order the Corps and FHWA to comply with the CWA, NEPA, APA, and Section 4(f) in connection with all further actions relating to this project.

## JURISDICTION AND VENUE

6.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 11 (federal officer action), 28 U.S.C. §§ 2201 and 2202 (declaratory judgment), 33 U.S.C. §§ 1365 *et seq.* (CWA), 42 U.S.C. §§ 4321 *et seq.* (NEPA), 49 U.S.C. § 303 (Section 4(f)), and 5 U.S.C. §§ 551 *et seq.* (APA),

7.   The violations of law alleged herein have largely occurred within the District of South Carolina. Venue for this action is proper in this Court pursuant to 28 U.S.C § 1391 and Local Civil Rule 3.01(A)(1).  Venue is appropriate in the Charleston division because a substantial part of the events and omissions giving rise to the claim occurred at the Corps of Engineers office in Charleston, the office of the Corps that issued the CWA permit allowing the construction of I-73. The Charleston District of the Corps of Engineers and Commander Palazzini reside in the Charleston Division and have conducted significant  business relating to this project in this Division.  The other Federal Defendants are located in Atlanta, GA and Washington, D.C, not other divisions of this District. The Conservation League and its counsel are based in the Charleston Division.

## PARTIES

**A.     Plaintiff**

8.     Plaintiff South Carolina Coastal Conservation League ("Conservation League") is a not-for-profit corporation founded in 1989.  The Conservation League is incorporated under the laws of South Carolina, maintains its headquarters office in Charleston, South Carolina, and currently has approximately 5,000 members.  Its mission is to protect the natural environment of South Carolina, including wetland, aquatic, and terrestrial habitats and ecologies, and to enhance the quality of life of South Carolina communities by working with individuals, businesses, and

government to ensure balanced solutions to environmental problems. The Conservation League seeks to preserve the quality of the natural environment while protecting human health and community livability from mutual threats such as air and water pollution and the fragmentation of human and ecological communities.

9.    The Conservation League represents the interests of members who live, work, and recreate in the immediate and general vicinity of the proposed project, and have an ongoing interest in protecting water quality and conserving wildlife and wildlife habitat in the areas impacted by the project. For example, I-73 will cross directly through the Little Pee Dee Heritage Preserve and Wildlife Management Area, eliminating outdoor recreational activities on public lands utilized by the Conservation League's members. The project will further impact numerous public waterways along the proposed I-73 corridor, including the Little Pee Dee River, used, enjoyed, and depended upon by the League and its members for recreation, fishing, aesthetic enjoyment, wildlife observation, and other uses. Degradation of the Little Pee Dee River ecosystem, including its wildlife habitat and aesthetic value, will impair the League and its members' use and enjoyment of the area, including the river reach crossed by I-73. Conservation League members, including recreational boaters as well as professional outfitters and tour guides who have led dozens, if not hundreds of guided kayak and canoe trips along the Little Pee Dee River, have repeatedly used and intend to use again the waters and lands impacted by I-73.

10.    The Conservation League also represents the interests of members who have property, human health, and aesthetic interests affected by I-73. Conservation League members have had portions of their rural properties purchased under threat of condemnation for I-73, and these members are now threatened by the construction of a new interstate highway across lands immediately adjacent to their homes. Such members are also reasonably concerned that the

visual, air quality, and noise impacts associated with I-73 – a new interstate highway through what is now a quiet, rural, and wild landscape – will negatively impact their day to day lives and long-term conservation interests. Members are further concerned that the filling and paving associated with I-73 construction will increase flooding risks on their real property.

11.     The Conservation League and its members have been and continue to be injured by FHWA's decision to prepare a Reevaluation instead of a SEIS as required by NEPA. Further, the Conservation League and its members are and continue to be injured by the Corps' and EPA's decisions to authorize discharges to waters of the United States for the I-73 project, including filling and clearing in wetlands and streams used by the Conservation League's members. The Conservation League and its members will be imminently and irreparably injured unless there is an order from this Court vacating the approval of the ROD, the 404 Permit, the EA, and the Reevaluations before project proponents undertake construction activities.

12.     As set forth above, the Conservation League and its members have recreational, aesthetic, property, and other concrete interests that will be adversely affected and irreparably harmed by the construction of I-73, due to the arbitrary and capricious decision-making of FHWA, the Corps, and EPA.  The Conservation League and its members are also directly harmed by the procedural failures alleged here, which have prevented them from fully participating in an open and public discussion of this project pursuant to NEPA.  Because the challenged federal agency decisions in the case – FHWA's issuance of Reevaluations instead of a SEIS and the Army Corps' and EPA's issuance and approval of the 404 Permit – are the cause of the Conservation League's and its members' injuries, an order from this Court vacating these decisions and requiring compliance with the law would redress the Conservation League's and its members' injuries.

**B.**    **Defendants**

13.    Defendant U.S. Army Corps of Engineers is an agency within the United States Department of Defense charged with permitting construction in waters of the United States. The Charleston District of the Corps, headquartered in Charleston, SC, is responsible for implementing Section 404 of the federal CWA in South Carolina.

14.    Defendant Lieutenant Colonel Jeffrey S. Palazzini is the Commander and District Engineer for the Charleston District of the U.S. Army Corps of Engineers, and is sued in his official capacity. He supervises and manages all Charleston District decisions and actions.

15.    Defendant Mark T. Esper is the Secretary of the Army, and is sued in his official capacity as the head of the federal agency that took final agency action challenged by this complaint.

16.    Defendant Lieutenant General Todd T. Semonite is the Commanding General and Chief of Engineers of the U.S. Army Corps of Engineers, and is sued in his official capacity.

17.    Defendant Federal Highway Administration is a federal agency within the U.S. Department of Transportation and was the lead agency under NEPA for the I-73 project.

18.    Defendant Dr. Walter C. Waidelich, Jr. is the Executive Director of the U.S. Department of Transportation, Federal Highway Administration, and is sued in his official capacity as the head of a federal agency that took final agency action challenged in this action.

19.    Defendant Environmental Protection Agency is an independent federal agency charged with overall implementation of the CWA, including ultimate responsibility for the protection of wetlands. Oversight of the CWA Section 404 permitting program in South Carolina is managed through EPA's Region IV office located in Atlanta, Georgia.

20.    Defendant Scott Pruitt is the Administrator of the EPA, and is sued in his official capacity as the head of the agency with ultimate responsibility for implementation of the CWA, including oversight of the Section 404 permitting program.

21.    Defendant South Carolina Department of Transportation, an agency of the State of South Carolina, is the project proponent for I-73 and the applicant for the CWA Section 404 Permit challenged in this action.

22.    Defendant Christy Hall is the Secretary of Transportation for the State of South Carolina, and is sued in her official capacity as the head of the agency that applied for the Section 404 Permit being challenged in this action.[1]

## LEGAL BACKGROUND

### A.  The Clean Water Act

23.    In 1972, Congress passed the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To achieve this objective, Section 301 of the CWA prohibits "the discharge of any pollutant" into "the navigable waters of the United States" except in accordance with permits issued under the CWA.  33 U.S.C. § 1311(a). "Navigable waters" are defined as "the waters of the United States, including the territorial seas." *Id.* § 1362(7). "Pollutants" include dredged spoil, rock, dirt, and sand, among other materials. *Id.* § 1362(6).

24.    Section 404 of the CWA authorizes the Secretary of the Army to issue permits for the discharge of dredged or fill material into "the waters of the United States" when certain conditions are met.  33 U.S.C. § 1344.  The Section 404 permitting program is administered by

---

[1] While the Conservation League does not specifically plead any claims against SCDOT or Secretary Hall, the Conservation League seeks to vacate the 404 Permit issued to SCDOT and requests injunctive relief to prevent SCDOT or Secretary Hall from taking any actions authorized by the 404 Permit.

the Corps, with ultimate authority for the program residing with the EPA. The term "waters of the United States" includes wetlands and streams that are tributaries to traditional navigable waters. 33 C.F.R. § 328.3(a) (Corps); 40 C.F.R. § 232.2 (EPA).

25.     Unless exempted by Section 404(f)(1), which is not applicable here, all discharges of fill material into waters of the United States, including wetlands, must be authorized under a Section 404 permit issued by the Corps.

26.     Issuance of all Section 404 permits is subject to the Section 404(b)(1) Guidelines found at 40 C.F.R. Part 230.  The Guidelines provide particular protection for wetlands, which are defined as "special aquatic sites," *id.* § 230.41, "the degradation or destruction of [which] is considered to be among the most severe environmental impacts covered by [the] Guidelines." *Id.* § 230.1.

27.     The Section 404(b)(1) Guidelines provide, *inter alia*, that no discharge of fill material may be permitted if there is a less damaging "practicable alternative" available, or if the discharge will "cause or contribute to significant degradation" of waters of the United States.  40 C.F.R. § 230.10.

28.     The Section 404(b)(1) Guidelines require that the Corps follow a specific two step procedure in applying the practicable alternative standard. First, a correct statement of the project's "basic purpose" is necessary. *See id.* § 230.10(a)(3). The Corps defines a project's basic purpose. *See* 33 C.F.R. Part 325, App. B(9)(b)(4). Second, after the Corps defines the basic purpose of the project, it must determine whether that basic purpose is "water dependent." *See* 40 C.F.R. § 230.10(a)(3). An activity is "water dependent" if it requires access or proximity within a wetland to fulfill its basic purpose. *Id.*

29.    If the activity is not "water dependent," as is the case here, the Guidelines require that the Corps apply a presumption that a practicable alternative with less adverse environmental impact on the wetland is available. *Id.* When this presumption applies, the applicant must then rebut the presumption by "clearly demonstrat[ing]" that a practicable alternative is not available, *id.*, and bears the burden of providing "detailed, clear, and convincing information *proving* that an alternative with less adverse impact is impracticable." *Greater Yellowstone Coalition v. Flowers,* 359 F.3d 1257, 1269 (10th Cir. 2004) (internal quotations and citation omitted).

30.    In conducting this analysis, the Corps may rely on information submitted by the applicant but must independently verify such information. *Id.*; 40 C.F.R. § 1506.5(a).

31.    Corps regulations further require that "the Corps will, in all cases, exercise independent judgment in defining the purpose and need for the project from both the applicant's and the public's perspective." 33 C.F.R. § 325, App. B(9)(b)(4). This ensures that "an applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable." *Sylvester v. U.S. Army Corps of Engineers*, 882 F.2d 407, 409 (9th Cir. 1989). Stated otherwise, "the definition of a project purpose may not be used by the sponsor as a tool to artificially exclude what would otherwise be practicable alternatives to the project." *Florida Clean Water Network, Inc. v. Grosskruger*, 587 F. Supp. 2d 1236, 1243–44 (M.D. Fla. 2008) (quoting *Sylvester*, 882 F.2d at 409).

32.    Under the Section 404(b)(1) Guidelines, the Corps must not only independently assess the overall project purpose, but also conduct its own "independent evaluation" of practicable alternatives to meet the purpose. *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 543 (11th Cir. 1996).

33. Where NEPA documents prepared by an applicant for a Section 404 permit "do not consider the alternatives in sufficient detail to respond to the requirements of the Guidelines, it may be necessary to supplement NEPA documents with additional information." *Utahns v. U.S. DOT,* 305 F.3d 1152, 1163 (10th Cir. 2002) (citing 40 C.F.R. § 230.10(a)(4)).

34. The Section 404(b)(1) Guidelines require the Corps to deny a permit unless the applicant can show that there are no practicable alternatives with less adverse impact on the aquatic ecosystem after consideration of a variety of factors, including: stream impacts (quantitative and qualitative), qualitative wetland function, impacts to other waters (quantitative and qualitative), impacts to threatened and endangered species, and cultural resources. 40 C.F.R. Part 230.

35. In addition to consideration of practicable alternatives, the 404(b)(1) Guidelines require a permittee to take "all appropriate and practicable steps to avoid and minimize adverse impacts to waters of the United States." 40 C.F.R. §§ 230.91(c)(2), 230.70–.77. Only after such steps are taken is compensatory mitigation permitted "to offset environmental losses resulting from unavoidable impacts to waters of the United States." 40 CFR § 230.93(a)(1).

36. Where permitted, "[c]ompensatory mitigation may be performed using the methods of restoration, enhancement, establishment, and in certain circumstances preservation." 40 C.F.R. § 230.93(a)(2). In general, "[r]estoration should generally be the first option considered because the likelihood of success is greater and the impacts to potentially ecologically important uplands are reduced compared to establishment, and the potential gains in terms of aquatic resource functions are greater, compared to enhancement and preservation." *Id.*

37.    CWA regulations further provide that "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States." 40 CFR § 230.10 (c).

38.    Corps regulations also provide that:

All activities which the applicant plans to undertake which are reasonably related to the same project and for which a DA permit would be required should be included in the same permit application. District engineers should reject, as incomplete, any permit application which fails to comply with this requirement. For example, a permit application for a marina will include dredging required for access as well as any fill associated with construction of the marina.

33 C.F.R. § 325.1(d)(2).

**B.  EPA Role in CWA Permitting**

39.    Pursuant to the U.S. Court of Appeals for the Fourth Circuit's decision in *National Wildlife Federation v. Hanson*, 859 F.2d 313, 315-16 (4th Cir. 1988), "both the Corps and the EPA are responsible for the issuance of permits under the CWA and enforcement of their terms. . . .  The EPA is ultimately responsible for the protection of wetlands."  In the Fourth Circuit, citizens may sue the EPA Administrator and the Corps "when the Corps abdicates its responsibility." *Id.* at 316.

40.    Section 404(q) of the CWA directs the Corps to enter into agreements with other federal agencies, including the EPA, governing 404 permit application processing. 33 U.S.C. § 1344(q).

41.    Under the governing Memorandum of Agreement between the EPA and the Department of the Army Regarding Section 404(q) of the Clean Water Act (Aug. 11, 1992), formal procedures have been established for the elevation of issues identified by EPA in individual permit cases that involve "aquatic resources of national importance" ("ARNI").

42.     When the EPA notifies the Corps by letter signed by the Regional Administrator that "in EPA's opinion the discharge *will* have a substantial and unacceptable impact on aquatic resources of national importance," the Corps must provide EPA with a Notice of Intent to Proceed before the Corps decides to move forward in issuing the permit. *Id.* at 8.

43.     Then, within 15 days of receipt of the draft permit or other notification from the Corps, EPA must formally notify the Corps whether or not the EPA will request higher level review and formally elevate the issue under the specific procedures established by the 404(q) Memorandum.

## C.  The National Environmental Policy Act

44.     Congress enacted NEPA to "promote efforts which will prevent or eliminate damages to the environment . . . ."  42 U.S.C. § 4321.  To achieve this goal, NEPA requires federal agencies to fully consider and publicly disclose the environmental consequences of an agency action *before* proceeding with that action.  *Id.* at § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.5.

45.     Agencies' evaluation of environmental consequences must be based on scientific information that is both "[a]ccurate" and of "high quality."  40 C.F.R. § 1500.1(b).  In addition, federal agencies must notify the public of proposed projects and allow the public the opportunity to comment on the environmental impacts of their actions.  *Id.* at § 1506.6.

46.     For major federal actions significantly affecting the quality of the human environment, NEPA requires that federal agencies prepare an Environmental Impact Statement ("EIS").  42 U.S.C. § 4332(2)(C).  Where it is not readily discernible whether the environmental effects of a proposed action will be significant, federal agencies may first prepare a less-rigorous Environmental Assessment ("EA") to establish the project's level of impact.  40 C.F.R. §§

13

1501.4(b), 1508.9(a)(1); 33 C.F.R. §§ 230.10 - 230.11. If impacts are likely to be significant, however, an EIS is then required.

47.    Under applicable Council of Environmental Quality ("CEQ") regulations, "[m]ajor Federal action" is defined to "includ[e] actions with effects that may be major and which are potentially subject to Federal control and responsibility."  40 C.F.R. § 1508.18. "Actions include new and continuing activities, including projects and programs entirely or partly . . . regulated[] or approved by federal agencies." *Id*.

48.    An EIS or EA must identify the direct, indirect, and cumulative impacts of the proposed action, consider alternative actions and their impacts, and identify all irreversible and irretrievable commitments of resources associated with the proposed action.  *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.14, 1508.7, 1508.8.  NEPA regulations also require an analysis of measures to mitigate the impacts of proposed actions.  *See* 40 C.F.R. §§ 1502.14(f), 1502.16(h).

49.    NEPA's requirement to consider "alternatives to the proposed action," 42 U.S.C. § 4332(2)(C)(iii) & (E), is the "heart" of the NEPA process and is intended to "provid[e] a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14.  The alternatives analysis should "serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made." *Id*. § 1502.2(g).  NEPA regulations also require an analysis of measures to mitigate the impacts of proposed actions. *See id.* §§ 1502.14(f), 1502.16(h).

50.    Federal agencies must prepare a SEIS for either a draft or final EIS if:

> (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or
> (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. § 1502.9(c)(1).

51.     FHWA regulations require a written evaluation of a final EIS "if major steps to advance the action . . . have not occurred within three years after the approval of the final EIS, final EIS supplement, or the last major Administration approval or grant." 23 C.F.R. § 771.29(b). Reevaluations are used to "determine whether or not a supplement to the draft EIS or a new draft EIS is needed," *id*. § 771.29(a), but do not substitute for a SEIS.

52.     CEQ guidance on the issue of stale NEPA analyses also notes that "EISs that are more than 5 years old should be carefully reexamined to determine if the criteria in Section 1502.9 compel preparation of an EIS supplement." Forty Questions, 46 Fed. Reg 18,026, 18,036 (March 23, 1981); *see also Or. Natural Res. Council Action v. USFS*, 445 F. Supp. 2d 1211, 1232 (D. Or. 2006) (finding this provision particularly applicable when dealing with EAs over 10 years old, citing the CEQ language).

53.     Agencies are required to "make clear" in an EIS where "there is incomplete or unavailable information" regarding "reasonably foreseeable significant adverse effects on the human environment." 40 C.F.R. § 1502.22. NEPA regulations further provide that where such incomplete information "is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant," the agency is required to include the information in the EIS or SEIS. *Id.* § 1502.22(a).

**D.  Section 4(f) of the Department of Transportation Act of 1966**

54.     Section 4(f) of the Department of Transportation Act of 1966, P.L. 89-670 (1966), ("Section 4(f)") prevents a federal project from using publicly owned land of a public park, recreation area, or significant wildlife and waterfowl refuge unless "(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible

planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. § 303(c); 23 U.S.C. 138(a).

55.     When there is no feasible and prudent alternative that avoids the use of public lands, "the Administration may approve only the alternative that . . . [c]auses the least overall harm," using a balancing of seven factors.   23 C.F.R. § 774.3(c)(1); *see also* 49 U.S.C. § 303(c)(2) (requiring "all possible planning" to minimize harm). At the heart of Section 4(f) lies the policy that "special effort should be made to preserve the natural beauty of the countryside," including "public park and recreation lands . . . and historic sites" in the development of transportation plans. 49 U.S.C. § 303(a), (b).

56.     Section 4(f) applies to both direct and indirect impacts such as noise and air pollution, with applicable regulations providing that "use" of a Section 4(f) property occurs in three situations:

> (1) When land is permanently incorporated into a transportation facility;
>
> (2) When there is a temporary occupancy of land that is adverse in terms of the statute's preservation purpose as determined by the criteria in §774.13(d); or
>
> 3) When there is a constructive use of a Section 4(f) property as determined by the criteria in §774.15.

23 C.F.R. § 774.17. Courts have held that the term "use" is to be construed broadly in the Section 4(f) context. *See Brooks v. Volpe*, 460 F.2d 1193, 1194 (9th Cir. 1972); *Adler v. Lewis*, 675 F.2d 1085, 1092 (9th Cir. 1982).

57.     A "constructive use" occurs when a project does not incorporate Section 4(f) land, but "the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired." 23 C.F.R. § 774.15(a).

58.    "Substantial impairment" occurs when the protected activities, features, or attributes of a property are "substantially diminished." *Id.* Further, the regulations identify specific examples of proximity impacts that may constitute a "constructive use" of Section 4(f) land, including noise, aesthetic, and vibration impacts, restricting public access, and ecological intrusion. *Id.* § 774.15(e).

59.    Regulations implementing Section 4(f) provide that:

(c) After the CE, FONSI, or ROD has been processed, a separate Section 4(f) approval will be required…if: . . .

> (3) A proposed modification of the alignment, design, or measures to minimize harm (after the original Section 4(f) approval) would result in a substantial increase in the amount of Section 4(f) property used, a substantial increase in the adverse impacts to Section 4(f) property, or a substantial reduction in the measures to minimize harm.

23 C.F.R. § 774.9(c).

**E. Administrative Procedures Act**

60.    The APA provides for judicial review of the actions and decisions of federal agencies. "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Further, "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704.

61.    Under Section 706(1) of the APA, the reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

62.    Under Section 706(2) of the APA, the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

## STATEMENT OF FACTS

**A. The I-73 Concept**

63.     I-73 is a concept for a national highway corridor that was initially planned to run from Sault Ste. Marie, Michigan to near Myrtle Beach, South Carolina. After decades of planning, however, the national I-73 still remains largely unbuilt, with less than 100 miles of more than 1,150 miles of planned corridor having been constructed and designated as part of the Interstate Highway System. Only about twenty miles of new location interstate highway have been constructed along the six-state I-73 corridor. The states along the route have largely abandoned plans for I-73.

64.     Upon information and belief, less than two hundred additional miles remain in various planning stages in the different states, and less than 100 miles of additional I-73 roadway are now planned outside of South Carolina.

65.     The segment of I-73 at issue here is proposed as a new location interstate highway from I-74 near Rockingham, North Carolina to SC 22 near Conway, South Carolina.

66.     Throughout the NEPA process, SCDOT and FHWA pursued the I-73 project solely as an interstate highway and never evaluated the possibility of upgrading existing highway corridors to non-interstate standards. For over 10 years, the Conservation League and others have requested that Defendants consider upgrading existing roadways, including the SC 38/US 501 and SC 9 corridors, to accommodate the stated need for the project. Defendants, however, have steadfastly refused to consider any such non-interstate alternatives. Nor did the Defendants seriously consider upgrading these existing highways to interstate standards, focusing instead solely on alternative routes for a new location interstate.

67.     Since the EISs were issued for I-73, the prospects for a national I-73 corridor have

18

greatly diminished.  Most states have effectively abandoned plans to construct I-73, thereby undermining the need for I-73 in South Carolina to provide interstate linkage as part of a national highway corridor.

**B.  I-73 in South Carolina**

68.    In South Carolina, I-73 is proposed as a 75.3 miles-long interstate highway from SC 22 near Conway to the North Carolina border north of Bennettsville. An additional five miles of interstate in North Carolina would also be required to connect I-73 with I-74 near Rockingham. The 404 Permit, however, does not cover discharge of fill materials into wetlands and streams in North Carolina.

69.    To bring I-73 to Myrtle Beach, SCDOT also proposes additional improvements to about 28 miles of existing SC 22 and conversion of SC 22 to I-73.

70.    The 404 Permit would authorize impacts to 17 separate streams, 139 separate wetlands, and 5 separate ponds or impoundments, allowing permanent placement of fill in a total of 4,643 linear feet of streams, or approximately 0.9 miles, as well as fill, clearing, and excavation impacts to a total of 324.1 acres, more than one-half square mile, of jurisdictional wetlands in South Carolina. Many of the impacted streams would be crossed multiple times, and a total of 59 stream crossings would be constructed, including the North Carolina segment of this project.

71.    I-73 would require a new bridge over the Little Pee Dee River, adjacent to an existing two-lane bridge along SC Route 917, and would cross through the Little Pee Dee River Heritage Preserve and Wildlife Management Area ("Little Pee Dee Preserve"). Approximately 30 acres of the Vaughn Tract of the Little Pee Dee Preserve would be removed from the Heritage Preserve and Wildlife Management Area systems to accommodate the construction of I-73. I-73

would destroy farmland, forest areas, streams, and wetlands, and fragment valuable wildlife habitat, including an important corridor for black bears.

72.    I-73 would require the relocation of dozens of structures, including homes, businesses, and churches. It will divide family farms and working forest tracts. Adjacent property owners will be affected by noise, vibration, and air emissions during both the construction and operation of I-73. The construction of I-73 will raise ground elevations and increase the amount of impervious surface in many areas, increasing the risk of localized flooding.

**C. FHWA's Approval of I-73 in South Carolina**

73.    On August 9, 2004, SCDOT and FHWA issued a Notice of Intent to prepare an EIS for the I-73 project in South Carolina. This notice marked the beginning of a NEPA process which ended in 2008, resulting in the Federal Defendants relying on significantly outdated information when they issued their most recent approvals in 2017.

74.    For purposes of the NEPA analysis, SCDOT and FHWA divided I-73 into two segments: I-73 North from the I-73/I-74 interchange in Rockingham, North Carolina to I-95, and I-73 South from I-95 to the Myrtle Beach area. The agencies jointly conducted separate NEPA analyses for the two segments.

75.    The Conservation League submitted substantial written comments regarding the scope of the NEPA process on September 15, 2004, and has continued to provide written comments and participate whenever permitted throughout the NEPA process.

76.    As part of the NEPA alternatives development process, SCDOT and FHWA utilized a GIS-based Corridor Analysis Tool (CAT) to identify potential corridors for an interstate highway.

77.    The agencies, however, never considered any non-interstate alternatives. Further,

20

many of the CAT selection parameters used by the agencies overestimated the impacts of interstate corridors using existing highways in comparison to new location corridors. As one example, wetland impacts of the preliminary alternatives were assessed by the CAT based on a 600 foot-wide I-73 corridor, despite a 300 foot-wide corridor generally being adequate to accommodate the I-73 design. Further, the "true least cost path" (from an environmental perspective) – a route recommended by staff at the South Carolina Department of Natural Resources that largely follows existing SC Route 9 – was "never even shown to the [Agency Coordination Team]."   In sum, the agencies rigged their analysis to prematurely reject all alternatives aside from new location interstate highways.

78.    On May 30, 2006, the Draft EIS for I-73 South was issued. The Conservation League filed substantial written comments on the DEIS dated July 28, 2006. On November 29, 2007, the Final EIS for I-73 South (South EIS) was issued.

79.    On July 19, 2007, the Draft EIS for I-73 North was issued. The Conservation League filed substantial written comments on the DEIS dated September 17, 2007. On August 6, 2008, the Final EIS for I-73 North (North EIS) was issued.

80.    At the time of FHWA's issuance of these NEPA approvals, SCDOT had not yet applied for a CWA Section 404 permit for I-73.

81.    On May 7, 2010, FHWA approved a Reevaluation ("2010 Reevaluation") to address various design changes since the ROD was approved. The 2010 Reevaluation concluded that the design changes were not significant and did not warrant preparation of a SEIS.  No public comment was sought by the agencies on the 2010 Reevaluation.

82.    On May 10, 2017, almost ten years after the original EISs for this project were issued, FHWA again prepared Reevaluations for both the I-73 South and I-73 North segments.

These reevaluations identified numerous changes in project design, circumstances, and information regarding the environmental impacts of I-73, but again concluded that "the changes were not found to be significant."

83.     There was no public involvement in the Reevaluation process. No drafts of the 2017 Reevaluations were made publicly available prior to finalization, no public comment was accepted, and the final versions were made available to the public only after completion.

84.     On July 11, 2017, the Conservation League made a written request to FHWA to reconsider its decision in the 2017 Reevaluations not to prepare a new EIS or SEIS. By that same letter, the Conservation League provided comments regarding the inadequacies of the 2017 Reevaluations, as well as a number of documents and reports regarding the impacts of I-73. These included a report from a transportation consultant describing, among other things, a variety of significantly changed circumstances relevant to environmental concerns associated with I-73. The Conservation League also provided FHWA with an updated wetland assessment report, providing significantly more detailed analysis of wetlands along the SC 38/US 501 corridor south of I-95. This analysis showed that upgrading this route would have dramatically fewer impacts on wetlands than the agencies' preferred alternative – 49.5 acres along a 200 foot expressway corridor or 118.9 acres along a 300 foot interstate corridor, as compared to the nearly 300 wetland acres that would be impacted by I-73 south of I-95.

85.     On July 19, 2017, FHWA responded to the Conservation League's July 11, 2017 letter, providing FHWA's determination that a new EIS or SEIS was not required.

86.     Despite repeated requests over the years, FHWA has never prepared an I-73 SEIS.

### D.  Project Changes and New Circumstances and Information Relevant to Environmental Concerns

87.    There have been extensive changes and new circumstances that have occurred since this project was fully analyzed a decade ago, including the following:

- The prospects for a national I-73 corridor from Michigan to South Carolina have collapsed;

- Portions of the proposed I-73 route have changed or been upgraded, including the re-design and widening of interchange ramps and multiple realignments along the Southern corridor;

- The cost of the project has risen dramatically, rising from $1.8 billion to $3.8 billion;

- The likelihood of tolling being necessary to fund I-73 construction has dramatically risen;

- Mitigation plans have completely changed;

- Significant changes in population growth and tourism have occurred, with resulting changes to the environment in the area of this project;

- A new inland port in Dillon, South Carolina is now under construction, dramatically increasing truck traffic projections, noise impacts, and cumulative impacts of I-73;

- Additional residential, commercial, and industrial development has occurred and is currently planned, resulting in substantial new filling of wetlands and streams in the I-73 area of impact and other cumulative impacts;

- Existing transportation infrastructure has significantly changed, including the construction of major new interchanges along the SC 38/US 501 corridor;

- New traffic modeling analysis has been completed for I-73, with "fundamental

changes to the updated model" leading to results that "cannot be compared directly" to the EIS traffic analysis;

- I-73's impacts to Section 4(f) resources, including noise, vibration, air quality, visual, and other related impacts, have increased, substantially impairing previously-unaffected public lands;

- The Atlantic sturgeon has been listed as an endangered species and critical habitat has been designated downstream from I-73;

- Significant new information exists regarding I-73's impacts on wetlands (over 30% increase in impacted acreage for I-73 North), streams (18% increase in impacted linear footage for I-73 South), and the Little Pee Dee River floodplain (34% increase in impacted length);

- Significant new information exists regarding I-73's induced environmental impacts, including induced regional population growth and the planned South Atlantic International Logistics Center.

88.     Of note, the dramatic cost increase for I-73 construction has not been followed by a similar increase in available funding for I-73. The Reevaluations indicate that $38.1 million of federal funding may still be available for I-73, although a "state or local funding match would be required to fully utilize these federal funds," and that "[f]unding sources to cover the remainder of the project have not been identified at this time." $38.1 million is about 1% of the projected $3.799 billion 2025 construction cost estimate, leaving I-73 99% unfunded.

89.     Accordingly, if I-73 is to be constructed, it is very likely to be constructed as a tolled highway, as SCDOT officials have publicly acknowledged. While SCDOT commissioned a 2016 study to evaluate the feasibility of tolling I-73, the Reevaluations did not evaluate the

direct, indirect, and cumulative effects of tolling on the natural and human environment, including the traffic impacts of tolling, whether a tolled highway would meet the agency's stated purpose and need for I-73 in South Carolina, or any other altered impacts associated with likely tolling. This information was obtainable and not exorbitant in cost to obtain.

90.    The Reevaluations also failed to consider a 2015 report prepared for SCDOT and FHWA and previously included as an appendix to the agencies' 2016 tolling study. In the 2015 report, Chmura Economics and Analytics found that "I-73 could boost the state population by 50,246." Similarly, Chmura projected that 30,460 more dwelling units could be built in the I-73 corridor by 2050 than projected under the no-build scenario. The Reevaluations did not evaluate the cumulative effects of this projected induced development.

91.    The Reevaluations did not update the Hurricane Evacuation Analysis relied upon by the South EIS despite that study being more than ten years old. The outdated 2005 Hurricane Evacuation Analysis completely fails to account for I-73's projected role in inducing residential and tourist population growth; thus, the evacuation analysis does not consider any delay in evacuation time that would be caused by an increased number of evacuees and dramatically overestimates the hurricane evacuation benefits, if any, of I-73.

92.    The Reevaluations consider the impacts of I-73 North and I-73 South as separate projects and do not assess the cumulative impacts of constructing both the North and South corridors of I-73.

93.    The Reevaluations concluded that the changes in project design, circumstances, and information regarding the environmental impacts of I-73 were not significant and did not warrant a SEIS.

### E.  The Corps Approval of I-73 in South Carolina

#### 1.  The Corps' CWA Approval

94.    In January 2011, SCDOT submitted a CWA Section 404 permit application to the Corps for I-73 North and I-73 South from the North Carolina/South Carolina border to the juncture with SC 22. The Conservation League provided extensive comments, including expert reports, in opposition to SCDOT's Section 404 permit application, dated March 28, 2011 and July 5, 2012.

95.    As detailed below, EPA, SCDNR and other conservation agencies vigorously objected to the application because the project resulted in unacceptable impacts on important aquatic resources. Further, the agencies contended that both an updated alternatives analysis and a new mitigation plan were required to meet requirements of the CWA. SCDOT ultimately withdrew this initial application prior to any final Corps' decision on the permit.

96.    In June 2016, SCDOT submitted a revised Section 404 permit application to the Corps, solely for the purpose of revising planned mitigation. The revised application did not, however, address EPA's and SCDNR's concerns regarding the need for additional alternatives analysis and the project's unacceptable impact on aquatic resources of national importance. The Conservation League submitted extensive comments on September 6, 2016.

97.    On June 19, 2017, the Corps issued its ROD and the 404 Permit. U.S. Army Corps of Engineers, Record of Decision, CESAC-RD-SAC-2008-1333, Interstate 73 (June 19, 2017). The Corps-issued 404 Permit covers the entire I-73 project in South Carolina from the North Carolina border to the juncture with SC 22.

98.    As explained above, the Conservation League has long advocated to the agencies, including the Corps, that upgrading the SC 38/US 501 corridor would meet the project need with

26

less impact on aquatic resources and the environment. Similarly, upgrading SC 9 to a four-lane highway would fulfill any valid need for the project.

99.    Just after the Corps received the permit application from SCDOT, by letter dated March 28, 2011, EPA also "highly recommend[ed] the consideration of [the] existing S.C. 38/U.S. 501 route, along with phased up-grades, as the preferred alternative for the I-73 corridor, as it is an existing four lane highway with up-grade potential, and transects already degraded waters of the U.S."

100.    EPA characterized this SC 38/US 501 upgrade alternative as a "lower impact alternative to the applicant's preferred alternative corridor," and recommended re-examination of both the SC 38/US 501 and SC 9 corridors using a more appropriate corridor width as well as aerial photography or more recent wetland inventories.

101.    EPA emphasized that "the use of the existing SC 38/US 501 road corridor would remove the need for a new crossing of Aquatic Resources of National Importance (ARNI) including the State Heritage Preserve wetlands and streams and the Lake Swamp area." In contrast, EPA concluded that the proposed I-73 project "does not comply with the Section 404(b)(1) Guidelines and will have substantial and unacceptable adverse impacts on ARNI," and therefore recommended denial of the project.

102.    SCDNR consistently advocated for further consideration of the SC 9 highway corridor as an alternative route. According to SCDNR staff, the "true least cost path" in terms of environmental impact was never shown to the Agency Coordination Team during the alternatives assessment process.

103.    The Corps determined the filling activity associated with I-73 is not "water dependent," requiring a rigorous analysis of practicable alternatives under the CWA.

104.    Yet the Corps did not fully evaluate a range of practicable alternatives, but instead allowed SCDOT to mandate a specific project design – an interstate highway – by determining the project purpose to be "to provide an interstate link between the I-73/I-74 Corridor in North Carolina to the Myrtle Beach region in South Carolina, to serve residents, businesses, and travelers while fulfilling congressional intent in an environmentally sensitive manner."

105.    This narrowly-defined purpose statement foreclosed consideration of reasonable alternatives, such as upgrading existing roadways to expressway or other non-interstate standards. The Corps simply copied this project purpose statement from FHWA NEPA documents rather than independently evaluating the project purpose.

106.    By accepting the narrow range of alternatives provided by SCDOT and FHWA in the EISs and Reevaluations, the Corps failed to conduct any independent analysis of whether upgrades to existing roadways could meet the project purposes of serving regional trade and economic development needs, serving residents, businesses, and tourists, and improving hurricane evacuation times.

107.    The Corps also rejected Alternative 7 from the South EIS without independent consideration and based solely on FHWA's prior, narrow assessment of impacted wetland acreage rather than an evaluation of overall aquatic ecosystem impacts. The EIS specifically found Alternative 7 to be "reasonable," but rejected it based solely on acreage of impacted wetlands, failing to adequately account for the full range of aquatic ecosystem impacts identified by the 404(b)(1) Guidelines. Under the criteria of the 404(b)(1) Guidelines, the overall aquatic impacts of Alternative 7 are less than the route approved by the Corps. Alternative 7 more closely follows existing roadways; thus, the wetlands impacted are largely already in degraded condition, compared to the more pristine wetland habitats fragmented by the proposed I-73 route.

Further, Alternative 7 has fewer stream crossings (41 vs. 58 for the permitted alternative #3), less perennial stream impacts by linear feet, reduced community impacts, and fewer required relocations.

108.    SCDOT's proposed new mitigation plan is almost entirely based on the preservation of wetlands and streams at Gunter's Island. Yet preservation is not appropriate mitigation in this case because there is no realistic likelihood that the Gunter's Island property to be preserved would otherwise be developed in the near-term.

109.    The restoration component of the mitigation plan – removing a small section of roadway and a few culverts to restore 2.2 acres of wetlands – is wholly inadequate to compensate for the hundreds of acres of wetlands and nearly a mile of streams that will be impaired by I-73.

110.    As noted above, I-73 will run from SC 22 near Conway, SC to the juncture with I-74 near Rockingham, NC. Yet the Corps has only issued a permit for the South Carolina portion of I-73, indicating that a separate permit will be issued for the North Carolina portion of the highway. While North Carolina has not taken any concrete steps to permit or construct this segment, SCDOT's planned construction of I-73 north of I-95 is completely dependent upon North Carolina's construction of this segment. Thus, this North Carolina segment is an integral part of SCDOT's I-73 project, a single highway project from SC 22 to the juncture with I-74 near Rockingham, North Carolina.

111.    Despite this, the Corps has allowed SCDOT to artificially segment this project at the state line. While I-73 construction activity in North Carolina is an integral part of the permitted activity in South Carolina, the 404 Permit does not cover discharges into waters of the United States in North Carolina from this segment of the overall project and the Corps completely failed to consider impacts in North Carolina, including the filling of 20 acres of

29

jurisdictional wetlands and more than a half-mile of streams. Filling streams and wetlands impacts water quality, aquatic ecosystems, and human uses across arbitrary state borders. Thus, an accurate assessment of the impacts of I-73 on the nation's aquatic resources – and those specifically in South Carolina – must consider the North Carolina portion of I-73.

112.    On November 13, 2017, the Conservation League sent notice to Defendants of the CWA claims in this complaint via certified U.S. mail pursuant to CWA Section 505(b)(2), 40 U.S.C. § 1365(b)(2), and 40 C.F.R. Part 135. More than sixty days have now passed since the sixty-day notice letter was served. 40 C.F.R. § 135.2 (notice deemed served on postmark date if mailed).[2]

### 2. The Corps' NEPA Process

113.    On June 5, 2017, the Army Corps finalized an EA for the I-73 project, adopting the 2010 and 2017 Reevaluations prepared by FHWA.

114.    The Corps' EA combined the purpose and need statements of the I-73 North and I-73 South projects from the Reevaluations into a single statement of purpose and need, but the Corps failed to independently assess the purpose and need, including FHWA's and SCDOT's determination that an interstate design was necessarily required.

115.    The Corps' EA did not evaluate impacts to jurisdictional wetlands and streams impacted by I-73 North in the North Carolina segment of the highway, despite the North Reevaluation indicating 20.1 acres of wetlands and 3,232.9 linear feet of streams will be directly

---

[2] On August 1, 2017, FHWA issued a Notice of Final Agency Action under 23 U.S.C. § 139(l)(1) limiting the time period for bringing claims challenging the Army Corps' issuance of the 404 Permit to a 150 day period expiring December 29, 2017. U.S. Dept. of Transp., Fed. Hwy. Admin., Notice of Final Agency Action on Proposed Interstate 73 in South Carolina, 82 Fed. Reg. 35869 (Aug. 1, 2017). This action is therefore timely filed.

impacted by I-73 in the five miles between the North Carolina/South Carolina border and the I-73/I-74 juncture.

116.    The EA notes that the 2017 Reevaluations identified an increase in noise receptors due to several factors, including a change in the assumptions regarding heavy truck traffic; however, the EA does not include any independent assessment of the significance or magnitude of the changes in identified noise impacts.

117.    As the EPA noted in its 2011 letters, the proposed route would require a new crossing of Aquatic Resources of National Importance, including State Heritage Preserve wetlands and streams and the Lake Swamp area, impacts that could be avoided with other available alternatives. The Corps failed to consider this fact.

118.    Despite acknowledging that funding sources for as much as 99% of the project costs have not yet been identified, the Corps "determined that the project is not unduly speculative."

119.    The Corps' decision documents, issued nearly a decade after the EISs, do not discuss any of the significant changes in the project, regional circumstances, and information regarding the environmental impacts of the project that were not addressed in the Reevaluations.

**F.  EPA Review of Project**

120.    As noted above, EPA submitted comments on this project in 2011, including serious objections to the Corps' inadequate alternatives analysis. EPA formally determined that the proposed project "does not comply with the Section 404(b)(1) Guidelines and will have substantial and unacceptable adverse impacts on [Aquatic Resources of National Importance]." Accordingly, EPA recommended denial of the proposed project.

121.    While the mitigation proposal has been substantially revised since 2011, there has been no change in the alternatives analysis or in the assessment of the impacts of I-73 to alter the conclusions in EPA's April 28, 2011 letter, namely that the project violates the 404(b)(1) Guidelines. Accordingly, nothing regarding the project itself has changed to alter EPA's conclusions and recommendation for denial of the project.

122.    While the EPA indicated by letter dated March 31, 2017 that "all concerns regarding mitigation have been addressed," EPA's concerns regarding the inadequate alternatives analysis and the high level of direct impacts from I-73 have never been resolved. The Corps never conducted any further evaluation of EPA's suggested alternatives, including the SC 38/US 501 and SC 9 corridors, as recommended by EPA. Nor has the Corps provided any of the "comprehensive information detailing the current stream and wetland conditions" requested by EPA to enable assessment of wetland conditions, including existing levels of impairment. I-

123.    After raising substantial concerns with SCDOT's 404 Permit application and formally concluding that the proposal will have "substantial and unacceptable adverse impacts" on Aquatic Resources of National Importance, EPA failed to formally notify the Corps whether or not it was elevating the issue, as required by the 404(q) elevation process outlined in the 404(q) Memorandum.

124.    After explaining that issuance of the 404 Permit would violate the 404(b) Guidelines unless less damaging practicable alternatives were considered and impacts on Aquatic Resources of National Importance were reduced, EPA abdicated its responsibility to ensure the lawfulness of the 404 Permit issued by the Corps.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### (Violation of CWA – Army Corps Unlawfully Violated Section 404 of the CWA and Applicable Regulations)

125.    The Conservation League incorporates the allegations of the preceding paragraphs as if set forth in full.

126.    The Corps erred in failing to exercise its independent judgment in adopting SCDOT's narrow statement of project purpose which wrongly requires a specific project design – namely an "interstate link."

127.    The Corps erred in failing to conduct an independent evaluation of practicable alternatives to I-73 and in blindly relying on FHWA's and SCDOT's outdated assessment of alternatives incorporated in the I-73 EISs.

128.    The Corps erred in accepting SCDOT's and FHWA's wrong  determination that upgrading existing highway corridors would have greater environmental impacts than construction of a new-location I-73, and in failing to consider contrary evidence.

129.    The Corps erred in approving the 404 Permit where there were lesser damaging practicable alternatives, including potential upgrades to the SC 38/US 501 and SC 9 corridors, as well as Alternative 7 from the South EIS.

130.    The Corps erred in conflating acreage of wetland impacts with overall impact to "aquatic resources" and violated the 404(b)(1) Guidelines by rejecting Alternative 7 based solely on acreage of impacted wetlands without consideration of other aquatic resource values.

131.    The Corps erred in approving the 404 Permit where the project has not avoided and minimized impacts to waters of the United States.

132.    The Corps erred in approving the 404 Permit where the permitted activities cause and contribute to significant degradation of waters of the United States, including unnecessary impacts to Aquatic Resources of National Importance.

133.    The Corps erred in approving the 404 Permit where the impacts to aquatic resources will not be adequately mitigated because the mitigation plan largely involves preserving lands that are not threatened by imminent development.

134.    The Corps erred in approving the 404 Permit where SCDOT's application did not cover the entire project, including all discharges to streams and wetlands from the construction of I-73 in North Carolina between the South Carolina border and the I-73/I-74 juncture.

135.    For all of these reasons, the Corps' issuance of the 404 Permit violated Section 404 of the CWA, 40 U.S.C. § 1344, and its implementing regulations, 40 C.F.R. Part 230. [3]

### SECOND CLAIM FOR RELIEF
**(Violation of CWA – EPA Unlawfully Violated Section 404 of the Clean Water Act and Applicable Regulations)**

136.    The Conservation League incorporates the allegations of the preceding paragraphs as if set forth in full.

137.    As the agency ultimately responsible for implementation of the CWA and protection of wetlands, the EPA is liable for the Army Corps' violations of the CWA and its implementing regulations.

138.    EPA failed to exercise its mandatory duty of oversight imposed by the CWA, including Section 404.

---

[3] Pursuant to the Fourth Circuit's decision in *Hanson*, 859 F.2d at 315–16, the Corps' violations of the CWA in issuing the 404 Permit are properly pleaded under the CWA citizen suit provision. 33 U.S.C. § 1365. In the alternative, however, the Corps actions in issuing the 404 Permit were arbitrary, capricious, and in violation of the CWA, and thereby cognizable as claims under the APA. 5 U.S.C. § 706(2).

139. After initiating the 404(q) elevation process, EPA acted contrary to law in failing to follow established 404(q) elevation procedures.

140. More specifically, EPA arbitrarily failed to object to issuance of the 404 Permit after explaining that issuance of the 404 Permit would violate the 404(b) Guidelines unless less damaging practicable alternatives were considered.

141. For all of these reasons, EPA's actions in approving the 404 Permit violated Section 404 of the CWA, 40 U.S.C. § 1344, and its implementing regulations, 40 C.F.R. Part 230.[4]

### THIRD CLAIM FOR RELIEF
**(Violation of NEPA and APA – FHWA Acted Arbitrarily and Capriciously and Not In Accordance with Law in Issuing the Reevaluations)**

142. The Conservation League incorporates the allegations of the preceding paragraphs as if set forth in full.

143. Substantial changes to the I-73 project have been made since the EISs were issued, including various realignments, interchange reconfigurations, and a completely new mitigation plan, relevant to environmental concerns and necessitating the preparation of a SEIS.

144. After the EISs were issued, there arose significant new circumstances and information relevant to environmental concerns and bearing on the I-73 project and its impacts, including but not limited to significant population growth and development, new projections for induced development, new traffic modeling, and significant increases in projected I-73 truck traffic, necessitating preparation of a SEIS.

---

[4] In the alternative, the EPA's failure to exercise its mandatory duty of CWA oversight constituted an unlawful "failure to act" in violation of the APA. 5 U.S.C. § 706(1).

145.    FHWA's Reevaluations failed to take a hard look at the environmental impacts of I-73 project changes or the significant new circumstances and new information bearing on the project and its environmental impacts, as required by NEPA and its implementing regulations.

146.    The Reevaluations erred in concluding that no SEIS was required to meet NEPA requirements.

147.    For all of these reasons, in issuing the Reevaluations instead of preparing a SEIS, FHWA's actions were arbitrary, capricious, an abuse of discretion, and in violation of the APA, 5 U.S.C. § 706(2), and NEPA, 43 U.S.C. § 4321 *et seq.*

## FOURTH CLAIM FOR RELIEF
**(Violation of NEPA and the APA – The Corps Acted Arbitrarily and Capriciously and Not In Accordance with Law in Issuing the ROD and EA)**

148.    The Conservation League incorporates the allegations of the preceding paragraphs as if set forth in full.

149.    The Corps erred in adopting the EISs and Reevaluations prepared by FHWA and SCDOT without independently assessing the environmental impacts of the I-73 project. The Corps erred by failing to take a hard look at the environmental impacts described in the adopted NEPA documents and by not considering any additional information bearing on environmental impacts not included in the adopted documents.

150.    The Corps erred by failing to take a hard look at the substantial project changes relevant to environmental impacts and the significant new circumstances and new information related to the environmental impacts of the I-73 project that have arisen since the EISs were issued.

151.    The Corps erred by failing to take a hard look at the purpose and need for the I-73 project, particularly in light of the substantial project changes, significant new circumstances,

and significant new information that undermined FHWA's and SCDOT's outdated determination that the purpose and need for the project necessitated construction of a new interstate highway.

152.    For all of these reasons, the Corps' actions in issuing the EA and ROD were arbitrary, capricious, an abuse of discretion, and in violation of the APA, 5 U.S.C. § 706(2), and NEPA, 42 U.S.C. §§ 4321 *et seq.*,  and its applicable regulations. 40 C.F.R. § 1502.9(c)(1).

## FIFTH CLAIM FOR RELIEF
### (Violation of NEPA and APA – The Corps and FHWA Unlawfully Withheld Required Agency Action by Not Preparing a Supplemental Environmental Impact Statement)

153.    The Conservation League incorporates the allegations of the preceding paragraphs as if set forth in full.

154.    In light of the substantial changes in the I-73 project, as well as significant new circumstances and information related to the environmental impacts of the project arising after issuance of the EISs, FHWA was required to prepare a SEIS pursuant to 40 C.F.R. § 1502.9(c)(1).

155.    For the same reasons, the Corps was required to prepare a SEIS before issuing the ROD and 404 Permit.

156.    Neither FHWA nor the Corps prepared a SEIS.

157.    For all of these reasons, FHWA and the Corps unlawfully withheld agency action required by law in violation of APA § 706(1) and 40 C.F.R. § 1502.9(c)(1).

## SIXTH CLAIM FOR RELIEF
### (Violation of NEPA and APA – The Corps and FHWA Unlawfully Violated 40 C.F.R. § 1502.22)

158.    The Conservation League incorporates the allegations of the preceding paragraphs as if set forth in full.

159.    In promulgating their NEPA documents, the Corps and FHWA failed to obtain essential information necessary to a reasoned choice among alternatives  For example, the

agencies failed to include essential information on tolling impacts for this road, as well as updated air quality modeling based on new truck traffic projections. All of this information was necessary to adequately conduct the alternatives analysis here.

160.     The costs of obtaining omitted such information would not be exorbitant. A more detailed tolling study is already planned before tolling could be implemented on I-73.

161.     For all of these reasons, FHWA and the Corps unlawfully failed to consider readily available information essential to a reasoned choice among alternatives in violation of 40 C.F.R. § 1502.22.

## SEVENTH CLAIM FOR RELIEF
### (Violation of Department of Transportation Act of 1966 – FHWA Unlawfully Violated Section 4(f) and Implementing Regulations)

162.     The Conservation League incorporates the allegations of the preceding paragraphs as if set forth in full.

163.     Since the 4(f) evaluations for I-73 were completed, truck traffic projections through the Little Pee Dee Preserve have dramatically increased, impacting previously-unaffected Section 4(f) property.

164.     FHWA failed to prepare an updated Section 4(f) evaluation to account for these changes in project impacts and altered use of Section (4)(f) property.

165.     For all of these reasons, FHWA's failure to prepare a new Section 4(f) evaluation violated 23 U.S.C. § 138, 49 U.S.C. § 303, and 23 C.F.R. § 774.9(c)

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff South Carolina Coastal Conservation League respectfully requests that the Court:

A. Declare that the Corps' and EPA's issuance and approval of the 404 Permit violated the CWA and applicable regulations as described above;

B. Declare that the Corps' issuance of the EA and ROD violated the APA and NEPA and applicable regulations as described above;

C. Declare that FHWA's issuance of the Reevaluations violated the APA and NEPA and applicable regulations as described above;

D. Declare that the Corps and FHWA were each required to prepare a SEIS for the I-73 project under NEPA and its regulations, 40 C.F.R. § 1502.9(c)(1), and that failure to do so constituted unlawful withholding of required agency action in violation of the APA, NEPA, and all applicable implementing regulations;

E. Declare that FHWA was required to prepare a new Section 4(f) evaluation for the I-73 project under Section 4(f) of the Department of Transportation Act of 1966, and that failure to prepare a new Section 4(f) evaluation constituted an unlawful withholding of required agency action in violation of APA, the Department of Transportation Act of 1966, and all implementing regulations.

F. Vacate the Corps' EA, ROD, and 404 Permit;

G. Vacate the FHWA's 2017 Reevaluations;

H. Grant preliminary and permanent injunctive relief requiring SCDOT to suspend all activities authorized under the 404 Permit;

I. Grant preliminary and permanent injunctive relief to ensure that Defendants comply with the CWA, NEPA, and Section 4(f), and specifically to ensure that Defendants take no further actions towards proceeding with I-73 until they have complied with the CWA, NEPA, and Section 4(f);

J.      Allow the Conservation League its costs of suit, including reasonable attorneys' fees and expert witness fees, pursuant to 28 U.S.C. § 2412 and 33 U.S.C. § 1365(d).

K.      Grant the Conservation League such further and additional relief as this Court deems to be necessary and appropriate.

Respectfully submitted this 19th day of December, 2017.

/s/ Catherine M. Wannamaker
SC Bar Number: 12577
Daniel L. Timmons
*Pro hac vice* forthcoming
Southern Environmental Law Center
463 King Street Street, Suite 200
Charleston, SC 29403
Telephone:  (843) 720-5270
Facsimile: (843) 720-5240

*Attorneys for Plaintiff South Carolina Coastal Conservation League*