UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| SOUTH CAROLINA COASTAL CONSERVATION LEAGUE, | ) ) ) | |
| Plaintiff, | ) | |
| vs. | ) ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, CHARLESTON DISTRICT; LTC JEFFREY S. PALAZZINI, in his official capacity as Commander of the Charleston District; LTG TODD T. SEMONITE, in his official capacity as Chief of Engineers; MARK T. ESPER, in his official capacity as the Secretary of the U.S. Army; UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION; THOMAS D. EVERETT, in his official capacity as Executive Director of the Federal Highway Administration; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; ANDREW WHEELER, in his official capacity as Administrator of the U.S. EPA; CHRISTY HALL, in her official capacity as South Carolina Secretary of Transportation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 2:17-cv-3412<br><br><br>**<u>Opinion and Order</u>** |
| Defendants. | ) ) | |

This matter is before the Court on Plaintiff South Carolina Coastal Conservation

League's motion for summary judgment (ECF No. 81); Defendants United States Army

Corps of Engineers, Charleston District, United States Environmental Protection Agency,

and United States Department of Transportation, Federal Highway Administration's

(collectively "Agencies") cross-motion for summary judgment (ECF No. 83); and

Defendant Christy Hall, Secretary of the South Carolina Department of Transportation's ("Secretary Hall") cross-motion for summary judgment (ECF No. 84). For the reasons set forth in this Order, the Agencies and Secretary Hall's (collectively "Defendants") motions are granted and the Court will enter judgment in Defendants' favor.

## OVERVIEW

This action challenges the allegedly unlawful approval of federal permits for construction of the South Carolina Department of Transportation's ("SCDOT") planned Interstate 73 ("I-73") project in South Carolina, a proposed new interstate highway to Myrtle Beach. (Am. Compl. ¶ 1, ECF No. 43.) Plaintiff South Carolina Coastal Conservation League ("Plaintiff" or "League") alleges that such a project would cost up to $3.8 billion to construct and unnecessarily destroy hundreds of acres of freshwater wetlands, despite the existence of viable, cheaper, and environmentally-preferable alternatives to the new roadway. (*Id.*) Plaintiff further alleges that Defendants U.S. Army Corps of Engineers and various Corps officials (collectively "Corps"), as well as the Federal Highway Administration and its officials (collectively "FHWA"), conducted incomplete and inadequate assessments of the purpose of, need for, environmental impact of, and alternatives to the I-73 plan. (*Id.* ¶¶ 2–3.)

Plaintiff seeks a declaration that the decisions by the Corps and U.S. Environmental Protection Agency and its officials (collectively "EPA") not to prepare a Supplemental Environmental Impact Statement ("SEIS"), but rather rely on a nearly ten-year-old Environmental Impact Statement ("EIS") and less searching "Reevaluations," as well as to approve the Record of Decision ("ROD") for the I-73 project were unlawful, arbitrary, and capricious in violation of the Administrative Procedures Act ("APA") and

National Environmental Policy Act ("NEPA"). (*Id.* ¶ 4.) Plaintiff further seeks a declaration that the Corps' and EPA's decisions to approve the relevant permit ("404 Permit") pursuant to Section 404 of the Clean Water Act ("CWA") were arbitrary, capricious, and in violation of the CWA. (*Id.*) Moreover, the League seeks a declaration that FHWA has violated NEPA, the APA, and Section 4(f) of the Department of Transportation Act of 1996 by approving the 2017 Reevaluations for I-73 and by failing to prepare a SEIS and an updated Section 4(f) evaluation. (*Id.*) The League asks the Court to vacate (1) the Corps' 404 Permit and associated ROD, (2) the Corps' Environmental Assessment ("EA"), and (3) FHWA's 2017 Reevaluations, and to order the Corps and FHWA to comply with the CWA, NEPA, APA, and Section 4(f) in connection with all further actions relating to the I-73 project. (*Id.* ¶ 5.)

## FACTUAL BACKGROUND

### A. Congressional calls for I-73

Efforts to develop I-73 have been underway since 1991. That year, the U.S. Congress enacted the Intermodal Surface Transportation Efficiency Act, which established I-73 as a "high priority" corridor on the national highway system to serve "regions of the Nation . . . not now adequately served by the Interstate System or comparable highways." Pub. L. No. 102–240, § 1105, 105 Stat. 1914, 2031 (Dec. 18, 1991) ("ISTEA"). Four years later, in the National Highway System Designation Act of 1995, Congress provided that roads along the I-73 corridor designed to interstate standards "shall be included" in the Interstate System and become eligible for certain funding. Pub. L. No. 104-59, § 332, 109 Stat. 568, 595 (Nov. 28, 1995). Three years after that, in the Transportation Equity Act for the 21st Century, Congress reiterated its call for

I-73 while moving the corridor's terminus from Charleston to Myrtle Beach. Pub. L. No. 105-178, § 1211, 112 Stat. 107, 188 (June 9, 1998). And in 2005's Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Congress earmarked $18 million to "[p]lan and build Interstate 73 from NC line to Myrtle Beach, SC," and another $40 million for "construction of I-73 from Myrtle Beach, SC to I-95, ending at the North Carolina State line." Pub. L. No. 109–59, 119 Stat. 1144, 1204, 1307 (Aug. 10, 2005) ("SAFETEA-LU").

### B. FHWA and SCDOT Preparation of the EISs

In accordance with Congress' statutory directives and with a similar call for an interstate by the South Carolina General Assembly (FHWA0000059)[1], SCDOT and FHWA began meeting in the 1990s and early 2000s to plan I-73's South Carolina stretch. (FHWA0000015–42.) In August 2004, FHWA issued a Notice of Intent "advis[ing] the public" that it and SCDOT would undertake NEPA review of a "proposed interstate highway" in eastern South Carolina. (FHWA0000221.) Because I-73 was anticipated to run some 80 miles within South Carolina, and because its tie-in point to the interstate system in North Carolina was then uncertain, FHWA and SCDOT developed separate EISs for two segments of I-73: one from the North Carolina state line to I-95 ("I-73 North"), and one from I-95 to near Myrtle Beach ("I-73 South"). (FHWA0000226.)

FHWA and SCDOT convened the Agency Coordination Team, or "ACT," a group representing over a dozen federal and state agencies. (FHWA0000162.) The ACT's role

---

[1] Administrative records compiled by the FHWA and the Corps were lodged with the Court on April 18, 2019. (See ECF No. 61.) The Court authorized certain supplemental FHWA documents for consideration, which were filed on April 9, 2020. (See ECF No. 75.) Indexes of each record are available on the Court's electronic docket. (ECF Nos. 61-1, 61-2, 61-3, 75-2.) Citations to the Agencies' records are in the following formats respectively: e.g., FHWA0000001, CORPS0000001.

was to assist in the NEPA process by reviewing information and providing technical expertise that would aid in evaluating and refining alternative approaches to I-73. EPA and the Corps participated in the ACT and were also "cooperating agencies" for purposes of NEPA. (FHWA0024702); *see also* 40 C.F.R. § 1508.5 (defining "cooperating agency").

FHWA and SCDOT first worked on the I-73 South EIS, beginning with the statement of project purpose and need. I-73 South's purpose, the agencies determined, was "to provide an interstate link between I-95 and the Myrtle Beach region to serve residents, businesses, and tourists while fulfilling congressional intent in an environmentally responsible and community sensitive manner." (FHWA0024705.)[2]

I-73 South's "primary needs," in turn, were to "[e]nhance economic opportunities and tourism in South Carolina," and "[i]mprove national and regional connectivity by providing a direct link" to Myrtle Beach. (FHWA0024705–06.) According to FHWA and SCDOT, I-73 South was also needed to "facilitate a more effective evacuation . . . during emergencies," an acute concern in Myrtle Beach where millions of people visit during the Atlantic hurricane season each year. (FHWA0024706, FHWA0024717–18.) Relatedly, I-73 was necessary to "reduce existing traffic congestion on roads accessing the Myrtle Beach region," which are crowded during the summer even absent the threat of hurricane. (FHWA0024706, FHWA0024719–20, FHWA0024770.) Finally, the project was needed to "[a]llow for future provision of a multimodal facility"—meaning a rail line—"within the

---

[2] FHWA and SCDOT subsequently defined I-73 North's purpose using similar language: "The Purpose of the proposed project is to provide an interstate link between the southernmost proposed segment of I-73 (between I-95 and the Myrtle Beach Region) and the North Carolina I-73/I-74 Corridor to serve residents, businesses, and travelers while fulfilling congressional intent in an environmentally responsible and community sensitive manner." (FHWA0030467.)

Interstate Corridor." (FHWA0024706, FHWA0024720.)[3]

FHWA and SCDOT next considered whether a "No-Build Alternative" (*i.e.*, existing roadways and planned upgrades) would satisfy the project purpose and needs. (FHWA0024731–33.) It would not, the agencies concluded, because (among other things), by 2030, existing arterial roads like U.S. 501 would receive an "F" under the State's "level of service" grading system due to gridlock during peak travel times, (FHWA0024770), and evacuation of Myrtle Beach on those roads would slow to a 37-hour crawl in the event of a major hurricane, (FHWA024732).

Thus, FHWA and SCDOT began investigating potential alignments for I-73. To that end, they developed the Corridor Analysis Tool ("CAT"), a computer program "designed to route conceptual corridors among . . . community and environmental resources." (FHWA003187.) Those resources were identified in Geographic Information System ("GIS") "layers"—essentially annotated maps—which the ACT compiled from various databases. (FHWA003187.) The National Wetlands Inventory ("NWI") GIS layer, for example, maps canals, ponds, meadows, and swamps, among other aquatic features. (FHWA0053215.) GIS layers derived from census data delineate demographic data like race, income, and population density. (FHWA0053212–16.) GIS layers created by state and county governments show the locations of roads, churches, schools, sewer lines, and much else. (*Id.*)

The ACT assigned an impact score between one and ten to each of the features in dozens of GIS layers. (FHWA0053213.) To illustrate: principal arterial roads received

---

[3] Similarly, I-73 North's primary needs were "system linkage" and "economic development" while its secondary needs were "improved access for tourism," "increased safety on existing roads," and "multimodal planning." (FHWA0030468.)

the lowest possible impact score of one. (FHWA0053215.) Hospitals and libraries were both rated eight. (FHWA0053216.) Freshwater marshes received a score of ten or seven, depending on their condition. (*Id.*) The ACT also weighted impact scores by category: "environmental" impacts were weighted most heavily, followed by "demographics/ socioeconomic" and "infrastructure" impacts, and impacts to "roadways" were weighted least. (FHWA0024736.) Finally, the ACT designated some features as "constraints," including Carolina Bays, archeological sites, cemeteries, schools, and wildlife refuges. (FHWA0053215–17.)

The GIS layers and weighted impact scores were programed into the CAT, which automatically produced the shortest possible routes between various endpoints that: (1) avoided all constraints; and (2) minimized impacts to the natural and built environment by generating the lowest possible weighted impacts scores. (FHWA0003189.) FHWA and SCDOT also asked members of the ACT to manually draw additional alignments on a map and these too were entered into the CAT. (FHWA0024736.) Through this process, FHWA and SCDOT generated 141 preliminary 600-foot corridors for I-73 South and 1,896 preliminary 500-foot corridors for I-73 North. (FHWA0024739, FHWA0030507.)

The ACT ranked these preliminary alternatives based on their relative impacts to wetlands (determined using NWI data), buildings, and infrastructure and then culled all but approximately two dozen of the lowest impact alternatives. (FHWA0024739, FHWA0030508–10.) Next, FHWA SCDOT solicited public comment on those remaining preliminary alternatives. (FHWA0024742, FHWA0030511–13.) Based on the public's feedback, the ACT again revised the remaining alternatives to avoid areas of concern before ultimately selecting eight Reasonable Build Alternatives for I-73 South and three

7

Reasonable Build Alternatives for I-73 North. (FHWA0024742–50, FHWA0030511–26.) Portions of all eight I-73 South Reasonable Build Alternatives followed existing roads, including S.C. 917, U.S. 501 and S.C. 22. (FHWA0024707.)

For each of the Reasonable Build Alternatives, FHWA and SCDOT mapped preliminary interchange locations and boundaries, construction zone limits, and bridge lengths. (FHWA0024747, FHWA0030526.) The ACT then used these more refined designs to hone estimates of each alternative's impacts. (*Id.*) That process entailed, *inter alia*, use of infrared aerial imagery and multiple site assessments to "update the NWI mapping for a more accurate representation of potential wetland boundaries." (FHWA0024748, FHWA0030722–24.)

While each of the Reasonable Build Alternatives generally satisfied project purpose and need, the ACT determined that some had obvious drawbacks. For instance, two I-73 South Reasonable Build Alternatives that were partially "located within the median of existing U.S. 501" would have required "an extensive frontage road system" that increased costs and expanded the project's footprint from roughly 300 feet to 400 feet. (FHWA0024800; *see also* FHWA0024698 (noting that portions of I-73 with frontage roads would be 400 feet wide).) Three other I-73 South Reasonable Build Alternatives drew substantial local opposition due to higher impacts to farmland and greater numbers of relocations. (FHWA0024799.)

Ultimately, FHWA and SCDOT selected as their "Preferred Alternatives" the alignments for both I-73 North and South that had the least impact on wetlands and lowest anticipated project costs. (FHWA0024799, FHWA0030542.) After selecting the Preferred Alternatives, FHWA and SCDOT again sought public comment and, in response to

comments received, again modified the routes and designs to reduce relocations. (*See* FHWA0024800–11, FHWA0024977–79, FHWA0030543–56.) With these changes, the agencies calculated that the final Preferred Alternative for I-73 South would impact 313 acres of wetland and 3,805 linear feet of stream. (FHWA0024970, FHWA0024973.) I-73 North's final Preferred Alternative, in turn, would impact 57.2 acres of wetlands and 14,944 linear feet of streams. (FHWA0030736.) FHWA concluded the EIS process in February and October 2008, when it issued Final EISs ("FEIS") and Records of Decision for I-73 South and I-73 North, respectively.

### C. FHWA Reevaluations

In 2010, FHWA completed a Reevaluation of the I-73 South Project. (FHWA0036087–237.) The purpose of the 2010 Reevaluation was to evaluate the impacts of proposed changes to the selected alternative. (FHWA0036087.) After evaluating the changes, FHWA concluded that they would not result in any new significant impacts requiring a SEIS. (FHWA0036087.)

In 2017, because more than three years had passed without any major action, FHWA conducted another round of Reevaluations for both I-73 North and South. (FHWA0052371–452, FHWA5003107–95); *see also* 23 C.F.R. § 771.129(b) (requiring preparation of a written evaluation if steps to advance the action "have not occurred within three years after the approval of the final EIS, final EIS supplement, or the last major Administration approval or grant"). There had been no alignment changes to I-73 North since the 2008 FEIS (FHWA0052393), and no alignment changes to I-73 South since the 2010 reevaluation (FHWA0053127). Therefore, the focus of the 2017 Reevaluations was to determine if there was "any new information or circumstances relevant to

environmental concerns with regards to the selected alternative and its impacts that would result in significant environmental impacts not evaluated in the FEIS." (FHWA0052393, FHWA0053127.)

In the 2017 Reevaluations, FHWA considered changes to projected wetland and stream impacts for I-73 North and South. (FHWA0052431–35, FHWA0053166–171.) FHWA also completed revised traffic and noise studies (FHWA0052538–628, FHWA0053801–931), examined potential changes to air quality impact (FHWA0052423–28; FHWA0053158–63), and assessed potential changes in induced development (FHWA0052397–99, FHWA0052408, FHWA0053130–33, FHWA0053140). Finally, through the 2017 Reevaluations, FHWA again examined possible impacts to so-called Section 4(f) resources and found that no new impacts would occur.[4] (FHWA0052402, FHWA0053139.) Based on this review, FHWA concluded that none of the changes identified and analyzed were significant, so no SEIS was required. (FHWA0053187, FHWA0052439.)

**D. SCDOT Section 404 Permit Applications**

In January 2011, SCDOT sought a Section 404 permit from the Corps for dredge and fill discharges associated with construction of the Preferred Alternatives for I-73 North and South. (CORPS0005036.) As part of that permit application, SCDOT also submitted proposed mitigation plans to offset impacts to wetlands and streams through the purchase of mitigation credits and through the restoration of two wetland sites and four streams.

---

[4] Section 4(f) of the Department of Transportation Act of 1966 regulates how publicly owned properties such as parks, recreational lands, wildlife and waterfowl refuges, and historic sites are used for transportation projects. (FHWA0030661.) The only Section 4(f) resource affected by the selected I-73 North alignment is a historic site proposed for demolition in the FEIS. (FHWA0031187–88, FHWA0035337.) The only Section 4(f) resource affected by the selected I-73 South alignment is the Vaughn tract of the Little Pee Dee Heritage Preserve. (FHWA0024912.)

(CORPS0005048, CORPS0008038–495 (wetland mitigation plan), CORPS0009315–481 (stream mitigation plan).)

In April 2011, EPA Region 4 raised concerns about SCDOT's permit application, citing what it perceived to be shortcomings in the evaluation of alternative routes in the FEISs and in SCDOT's proposed mitigation plans. (CORPS0007424–26.) After discussions with the Corps, FHWA, and SCDOT, EPA withdrew its criticisms of the alternatives analysis. (CORPS007504–07, CORPS0007515.) But several other agencies, including the Corps, also had concerns with SCDOT's mitigation plans. (CORPS0010446–62 (federal agency comments on SCDOT's proposed mitigation plan).) When, after more than a year, SCDOT proved "unable to provide finalized plans" that addressed the agencies' concerns (CORPS0014502), its permit application was deemed withdrawn (CORPS0015277).

In June 2016, SCDOT submitted a new Section 404 permit application. It sought authorization for proposed discharges associated with the same I-73 project as its 2011 application. However, the 2016 application included a substantially revised mitigation plan, one that would protect roughly 19 linear feet of stream and 13 acres of wetland for every foot of stream or wetland acre impacted by I-73. (CORPS0015344.)

Over the next year, the Corps reviewed the 2016 permit application, comments on the permit, SCDOT's responses to those comments, FHWA's Reevaluations, and the two FEISs. On the basis of that review, on June 5, 2017, the Corps finalized a 100-page EA in which it summarized and adopted the findings of the Reevaluations and FEISs and concluded that no SEIS was required. (CORPS0034344-443.)

On June 17, 2017, the Corps issued a ROD granting SCDOT's permit application.

In that document, the Corps determined that I-73's "basic purpose" was "not water-dependent," and that its "overall project purpose" was "to provide an interstate link between the I-73/I-74 Corridor to the Myrtle Beach region in South Carolina, to serve residents, businesses, and travelers while fulfilling congressional intent in an environmentally sensitive manner." (CORPS0034358.) The Corps also certified that it had independently reviewed the Reevaluations and FEISs, which it incorporated by reference. (CORPS0034449–50.) Moreover, the Corps summarized the findings of the 2008 FEISs in explaining how it reached its least environmentally damaging practicable alternative ("LEDPA") determination under the Section 404(b)(1) Guidelines. (CORPS0034460–76.)

## PROCEDURAL BACKGROUND

In December 2017, Plaintiff filed suit alleging violations of the CWA, NEPA, and the APA in connection with the Agencies' actions related to I-73. (Compl., ECF No. 1.) The Agencies moved for partial dismissal (ECF No. 12), and Plaintiff responded by filing an Amended Complaint (ECF No. 43). The Agencies again moved for partial dismissal (ECF No. 37), and the Court granted the motion in part, dismissing claims five and six of the Amended Complaint, as well as two alternatively pled theories of relief in claims one and two (ECF No. 54). The remaining claims in the Amended Complaint challenge: (1) FHWA's 2017 Reevaluations; (2) the Corps' 2017 EA, ROD, and Section 404 permit; and (3) EPA's decision not to "veto" the Corps' issuance of a Section 404 permit. (Am. Compl. ¶¶ 135; 141–43; 150; 156; 173.) In April 2019, each of the Agencies lodged a separate administrative record in support of its specifically challenged action. (ECF No. 61.) Plaintiff then moved the Court to complete the administrative records with several categories of documents. (ECF No. 65.) In February 2020, the Court directed supplementation of the

record with a post-decisional letter Plaintiff sent to FHWA in 2017, and FHWA's response. (ECF No. 72 at 17.) The Court otherwise denied Plaintiff's motion. (*See id.*) On August 3, 2020, Plaintiff moved for summary judgment. (ECF No. 81.) The Agencies filed a combined cross-motion for summary judgment and opposition to Plaintiff's summary judgment motion on November 4, 2020. (ECF No. 83.) Secretary Hall also filed a combined cross-motion for summary judgment and opposition on the same day. (ECF No. 84.) Having received permission from the Court, the Myrtle Beach Area Chamber of Commerce filed an amicus brief on March 24, 2021. (ECF No. 90.) These matters are fully briefed (*see* ECF Nos. 89, 91, 92), and ripe for disposition. Accordingly, the Court now issues the following ruling.

## STANDARD OF REVIEW

Summary judgment is appropriate when a court finds that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Claims asserting violations of the CWA and NEPA are subject to judicial review under the APA, 5 U.S.C. § 706. A court's review of agency action is limited to the administrative record that was before the agency at the time the decision was made. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). Under the APA, agency action may only be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under the "arbitrary and capricious" standard is "highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). The court's role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of

13

judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* Because a court's fact-finding role is absent in an administrative record case such as the one at bar, "[s]ummary judgment is particularly appropriate . . . ." Wright, Miller, & Kane, 10B Fed. Prac. & Proc. Civ. § 2733.

## DISCUSSION

### I. National Environmental Protection Act Compliance

#### A. Time Barred NEPA Claims

Throughout its brief, Plaintiff asserts that the Agencies erred at the outset by inappropriately defining the purpose of the project as an "interstate link" and conducting skewed alternatives analyses as a result. (*See, e.g.*, ECF No. 81-1 at 16–17, n.2 ("As other states have abandoned or significantly curtailed the original vision for I-73, Defendants' claim that a new interstate highway is needed to fulfill congressional intent has been severely weakened.").) Because those assertions concern the reasonableness of FHWA's 2008 FEISs, the Court finds it necessary to first clarify the scope of Plaintiff's cognizable NEPA claims. Any direct NEPA challenge to the 2008 FEISs and RODs—including FHWA's purpose statement and alternatives analysis—is time-barred under the six-year statute of limitations applicable to APA claims. *See* 28 U.S.C. § 2401(a); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 186 (4th Cir. 1999) (stating "the eight-year interval between the ROD and the filing of this complaint exceeds the statute of limitations for each of appellants' pre-ROD claims"); *Hire Order Ltd. v. Marianos*, 698 F.3d 168, 170 (4th Cir. 2012) ("A cause of action governed by § 2401(a) accrues or

begins to run at the time of 'final agency action.'" (citations omitted)). Accordingly, Plaintiff's only cognizable NEPA claims concern the Corps' and FHWA's decisions not to supplement the FEISs in light of allegedly changed circumstances.

## B. Whether Supplemental Environmental Impact Statements Were Required

Plaintiff contends that FHWA and the Corps violated NEPA because both agencies declined to supplement FHWA's 2008 FEISs. (ECF No. 81-1 at 24–31.) The applicable NEPA regulations required agencies to supplement an existing EIS when "(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1) (2018). A SEIS is required when changes or new information present a "'*seriously* different picture of the environmental impact of the proposed project from what was previously envisioned.'" *Hickory Neighborhood Def. League v. Skinner*, 893 F.2d 58, 63 (4th Cir. 1990) (quoting *Sierra Club v. Froehlke*, 816 F.2d 205, 210 (5th Cir. 1987)) (emphasis in original). An agency's determination of whether supplementation is required is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise" and review of that determination implicates deference to "the informed discretion of the responsible federal agencies." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 376–77 (1989). Review of an agency's determination that an EIS need not be supplemented is controlled by the "arbitrary and capricious" standard of 5 U.S.C. § 706(2)(A). *Id.* at 376.

In this case, FHWA and the Corps considered project changes and new information that emerged since the 2008 FEISs, and concluded that the circumstances

did not merit a SEIS. (*See supra* at 9–12.) Plaintiff disagrees with those conclusions. However, the Court finds that Plaintiff's proffered "substantial changes" and "new information" are insufficient to show that FHWA and the Corps' determination that a SEIS was not required was arbitrary and capricious.

**First**, Plaintiff argues that a SEIS is required to "fully disclose and evaluate" the plan to construct I-73 as a toll road, because tolls allegedly represent a "fundamental change in the project and the associated environmental impacts." (ECF No. 81-1 at 24–27.) The flaw in this argument is that there is no final agency action authorizing the construction of tolls on I-73. In the absence of a federally authorized plan to incorporate tolls, Plaintiff's assertion that a SEIS is required on that basis is without merit.

Beginning with the FEIS, FHWA has evaluated the potential environmental effects of I-73 as "a non-tolled highway." (FHWA0024725, FHWA0030424.) Based on its analysis, FHWA selected and approved construction alternatives that do not include tolls. (FHWA0029575, FHWA0035345.) Nevertheless, from the outset FHWA acknowledged in the FEIS that tolling is a possibility and stated, "Further NEPA analysis would be completed if the facility is tolled in the future." (FHWA0024725 FHWA0030424.) When it completed the 2017 Reevaluations, FHWA reiterated that "there is currently no plan . . . to toll I-73," and that "[i]f tolls were to be implemented in the future, NEPA documentation would be completed to address the direct, indirect, and cumulative impacts[.]" (FHWA0053125, FHWA0052392.) Likewise, in its EA and ROD, the Corps accepted FHWA's statement that tolling is not part of I-73's current project design. (CORPS0034368, CORPS0034454.) Thus, the records show that neither FHWA nor the Corps have authorized construction of tolls as a part of I-73.

16

Plaintiff's evidence that the Agencies have changed the I-73 project to include tolls is unconvincing. Plaintiff states, "In July 2007, [SCDOT] submitted an application to FHWA—and quickly received approval—to designate I-73 as a toll project." (ECF No. 81-1 at 25.) While it is true that SCDOT submitted an application to designate I-73 "as a toll project under the Interstate System Construction [] Toll Pilot Program" (FHWA0024458), it is not true that the I-73 project was effectively changed to incorporate tolls. In response to SCDOT's submission, FHWA informed SCDOT that the application did "not contain all the information required for eligibility." (FHWA0024486.) Accordingly, FHWA granted SCDOT's application only "'conditional acceptance' pending the completion of all application requirements" and other conditions. (*Id*.; *see also* FHWA0035919 (approving SCDOT's application "as a placeholder").) FHWA also stated, "Upon environmental clearance (which would include evaluation of the impacts of tolling), the facility segments will become eligible to be considered for final approval under the pilot program, provided all other provisions have been satisfactorily addressed[.]" (FHWA0024487.) The Agencies contend that, since the conditional acceptance, SCDOT has neither addressed the requirements for "final approval" nor submitted any other request to incorporate tolls (ECF No. 83-1 at 24), and Plaintiff has not submitted evidence to prove otherwise. Thus, the records refute Plaintiff's claim that the Agencies have provided final approval to designate I-73 as a toll project or taken other action to incorporate tolls.

Without a final agency action[5] incorporating tolls on I-73, Plaintiff's call for a SEIS on that basis does not come within the ambit of the APA's arbitrary and capricious

---

[5] Final actions are those (1) that "mark the consummation of the agency's decisionmaking process," and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations and quotation marks omitted).

standard, which permits judicial review only of final agency actions. 5 U.S.C. § 704. Here, there is no such final agency action authorizing the construction of tolls. Indeed, the only agency actions Plaintiff challenges are FHWA's 2017 Reevaluations and the Corps' ROD and EA (Am. Compl. ¶¶ 149, 152), none of which approve a tolled version of I-73. Plaintiff's brief admits as much when it states that a funding shortfall increases the "likelihood" that SCDOT will toll I-73. (ECF No. 81-1 at 25.) This Court cannot review "likely" agency actions, regardless of the "likelihood" that such actions may be taken in the future, and Plaintiff's claims are at best premature. *See, e.g., Friends of the Wild Swan, Inc. v. United States Forest Serv.*, 910 F. Supp. 1500, 1508–09 (D. Or. 1995) (declining to conduct "premature review of the [agency's] proposed plans" where a plaintiff could not "identify a final agency action which is ripe for review with regard to whether the [agency] must . . . provide a supplemental EIS under NEPA."). Absent a final agency action approving tolls on I-73, this aspect of Plaintiff's supplementation arguments fails.

**Second**, Plaintiff asserts there is significant new information regarding I-73's environmental impacts that requires a SEIS. (ECF No. 81-1 at 27–31.) With regard to wetlands, Plaintiff claims a supplement is required because FHWA and SCDOT discovered more wetland impacts since the FEISs. Plaintiff points to the Reevaluations and notes that wetland impacts for I-73 North increased to 75.8 acres from 57.2 acres, and stream impacts for I-73 South increased to 4,571 linear feet from 3,860 linear feet. (*Id.* at 28.) However, the Reevaluations make clear that while potential wetland impacts increased along some areas of the route, they decreased in others. (FHWA0052432, FHWA0053168.) In fact, the Reevaluations show that combined estimated stream impacts from I-73 North and South *decreased* from 18,799 linear feet to 7,893.9 linear

18

feet. (*See* FHWA0052432, FHWA0053168.) Combined wetland impacts from I-73 North and South also *decreased* from a total of 370.2 acres to 368.1 acres. (FHWA0053168, FHWA0052432.)

Additionally, while the Reevaluations do identify changes to projected wetland and stream impacts, those changes are largely due to updates in how wetlands were classified and delineated, rather than the result of significant changes in the project or circumstances on the ground. (FHWA0052431–32, FHWA0053166–68.) NEPA requires a SEIS in response to significant new circumstances relevant to a project's environmental impacts. A change in the legal status of a resource, however, is not a "new circumstance" that requires supplementation. *See Swanson v. United States Forest Serv.*, 87 F.3d 339, 344 (9th Cir. 1996) (holding that the change in a species' "legal status" did not alter its "biological status" and so "did not constitute new information" that would require a SEIS). Thus, changes in how wetlands are delineated are not the kind of changes that trigger a SEIS under the circumstances of this case.

In light of the above, both FHWA and the Corps determined that the changes to calculated wetland and stream impacts were not significant. (FHWA53187, FHWA0052446, CORPS0034412.) Indeed, Plaintiff's own consultant described the changes as "relatively minor." (FHWA0054792.) When viewed in context, the record makes clear that the changes at issue fall short of presenting a "*seriously* different picture of the environmental impact of the proposed project," that would require supplementation. *Hickory*, 893 F.2d at 63.

**Third**, Plaintiff contends that "new information" requiring a SEIS exists in the form of "new reports [that] cast serious doubt on the wetland impacts analysis presented in the

FEISs." (ECF No. 81-1 at 28.) However, the "new reports" to which Plaintiff refers do not contain new information regarding the impacts of I-73, but rather novel analyses—commissioned by Plaintiff—of "non-selected alternatives." Moreover, the "new" conclusions in the reports that Plaintiff highlights are repackaged versions of criticisms that Plaintiff began levying prior to the 2008 FEISs and do not show that a SEIS is warranted.

In 2011 and 2012, Plaintiff submitted to the Corps and FHWA three reports in response to SCDOT's original application for a Section 404 permit: (1) "The Grand Strand Expressway: An Alternative to the Proposed I-73 to the Myrtle Beach Area" (Smart Mobility Report, FHWA0036873); (2) "Aerial Photographic Analysis Comparing Aquatic Impacts of S.C. 38/U.S. 501 Upgrade with Proposed I-73" (Aerial Photo Report, FHWA0037018); and (3) "Economic Analysis of I-73 and the Grand Strand Expressway Alternative" (Miley Report, FHWA0036985–89). The Smart Mobility Report concludes that upgrading parts of existing roads—including S.C. 38/U.S. 501—to expressways could meet the "region's transportation needs." (FHWA0036881–84.) The Aerial Photo Report concludes that upgrading S.C. 38/U.S. 501 to an expressway or an interstate would have fewer impacts than I-73 South. (FHWA0037020–21.) Finally, the Miley Report asserts that the upgrade concepts in the Smart Mobility Report are "more cost effective" than I-73. (FHWA0036991.)

Even if the information in Plaintiff's reports were both new and significant, NEPA would not require a SEIS as a matter of law because Plaintiff's reports relate to the alleged benefits of Plaintiff's preferred *alternative* to I-73, namely upgrades to existing roads. NEPA requires a SEIS only for new information "bearing on the *proposed action or its*

impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (2018) (emphasis added). Plaintiff's argument for supplementation fails because it is premised on the reports containing new information not about the *chosen action*, but about impacts of alternatives FHWA *did not choose*. The reports do not show, as they must, that I-73 is likely to "affect the quality of the human environment in a significant manner or to a significant extent not already considered" in the FEISs. *Marsh*, 490 U.S. at 374 (citation, alteration, and quotation marks omitted). Instead, they seek to undercut the FEISs' alternatives analysis and thereby require the Agencies to study the alternatives again from scratch. Neither the text of the applicable regulations nor NEPA's "rule of reason" countenance this result. *See id.* at 373 (explaining the "rule of reason" and stating  that "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized," because "[t]o require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made"). Here, the FEISs considered "141 preliminary build alternatives for the I-73 South project and 1,896 preliminary build alternatives for I-73 North." (FHWA0052710.) If all it took to trigger a SEIS was for a dissatisfied party to commission a study regarding a rejected or novel alternative, NEPA review would never be finished. *See, e.g.*, *N. Idaho Cmty. Action Network v. United States Dep't of Transp.*, 545 F.3d 1147, 1155 (9th Cir. 2008) ("An agency is not required by NEPA to consider new *alternatives* that come to light after issuance of the EIS . . . ." (emphasis in original)). Because Plaintiff's reports relate to alternatives that the Agencies did not select, rather than I-73 itself, NEPA does not require supplementation. *See Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984) (indicating that supplementation is required only when "the new information presents a

picture of the likely environmental consequences associated with the proposed action not envisioned by the original EIS").

**Fourth**, Plaintiff argues that predicted increases in truck traffic and associated changes to noise and air impacts require supplementation. (ECF No. 81-1 at 29.) The Court finds that the Reevaluations demonstrate otherwise. In the Reevaluations, FHWA discussed updated traffic models in the context of describing changes to the project's predicted noise impacts. (FHWA0053151–54, FHWA0052414–17.) Based on ten years of additional data, and due to the construction of an inland port in Dillon, South Carolina, those models predicted an increase in truck traffic on I-73. (*Id.*) In light of these updated forecasts, as well as "increased detail" in the analysis and the construction of new homes, the Reevaluations concluded that the number of noise receptors (places from which noise can be heard) increased for I-73 South from 13 to 71 (FHWA0053184), and for I-73 North from 10 to 26 (FHWA0052443, FHWA0052414–17). All additional noise receptors are residential properties. (FHWA0053153, FHWA0052416.)

As a result of these changes, the Reevaluations reconsidered noise abatement and mitigation measures. (FHWA0053154, FHWA0052418.) FHWA determined that noise barriers would not be a reasonable mitigation measure for the I-73 project because the "sparsity of development through the entire rural corridor" means abatement is not cost effective. (FHWA0052420, FHWA0052422, FHWA0053157, FHWA0053185.) Accordingly, FHWA concluded, as it did in the FEISs, that there were no feasible solutions to mitigate noise. (FHWA0052418–22, FHWA0053154–57, FHWA0030682–84.) Thus, although there was an increase in predicted noise impacts, that increase was not so significant as to change the appropriate mitigation response. *See Marsh*, 490 U.S. at 373.

22

Further, alteration of the alignment was not considered because the final design had already been modified to minimize impacts as much as possible. (FHWA0053155, FHWA0052418.) The Court finds that FHWA appropriately concluded the additional noise impacts were not significant, and Plaintiff's highlighting the simple fact of forecasted noise increases gives the Court no cause to set aside FHWA's reasoned judgment on the matter.

Plaintiff also asserts that the Agencies ignored significant increases in toxic air emissions resulting from increased heavy truck traffic. (ECF No. 81-1 at 29.) However, Plaintiff does not cite any record evidence for its assertion that air emissions, particularly toxic pollutants, will increase "far beyond levels discussed in the FEISs." (*Id*.) Plaintiff must do more than make unsupported assertions in order to refute the FHWA's analysis. *See New River Valley Greens v. U.S. Dep't of Transp.*, 161 F.3d 3, 1998 WL 633959, at *5 (4th Cir. 1998) (requiring plaintiffs to "demonstrate the inadequacy of the agency's analysis with hard evidence" as opposed to asking the court to deem impacts "self-evidently significant"); *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1059 (D.C. Cir. 2017) ("If an agency's decision not to prepare a SEIS turns on a factual dispute the resolution of which implicated substantial agency expertise, the court defers to the agency's judgment." (citation and quotation marks omitted)).

The record demonstrates that FHWA adequately considered the potential for significant impacts resulting from increased air emissions caused by increased truck traffic. FHWA determined that even though National Ambient Air Quality Standards ("NAAQS") were revised after the FEISs, all counties in both project study areas remained in attainment for NAAQs. (FHWA0053158, FHWA0052423.) Moreover, FHWA performed

additional analysis and relied on an EPA model to assess changes in air pollution (FHWA0052424–28, FHWA0053159–63.) The model incorporates new data, including data for light and heavy-duty vehicles. (FHWA0052424, FHWA0053159.) After evaluating the results for its revised air quality modeling, FHWA concluded that even with a projected forty-five (45) percent increase in vehicle miles traveled from 2010 to 2050, total annual emissions for the priority Mobile Source Air Toxics ("MSAT") would *decrease* by ninety-one (91) percent during the same period. (FHWA0052424, FHWA0053159.) While FHWA concluded that there would be higher MSAT emissions for the selected alternative along I-73, it also concluded there would be a corresponding decrease in MSAT emissions along parallel routes. (FHWA0052428, FHWA0053163.) FHWA further found that any emissions increases would be partially offset by lower MSAT emission rates due to the increased speed of traffic on I-73. (*Id*.) For these reasons, FHWA concluded that for I-73 North, there would be "no appreciable difference in overall MSAT emissions between the No-build and Selected Alternative and that under either alternative, emissions will likely be lower than present levels in the design year as a result of USEPA's national control programs." (*Id*.) For I-73 South, FHWA determined that the localized level of MSAT emissions for the selected alternative could be higher than the No-Build Alternative, but that it would be offset by increases in speed and reduction in congestion on the local road networks. (FHWA0053163.) The Court finds Plaintiff's arguments unpersuasive as to changes in air emission impacts requiring a SEIS. Any changes resulting from increased truck traffic were thoroughly evaluated by FHWA and reasonably found to be insignificant; therefore, supplementation is not required. *See New River*, 1998 WL 633959, at *4 ("The word 'significant' carries the weight of [the] regulation. Without it, NEPA compliance could

paralyze executive agencies, forcing them to perpetually reevaluate proposed projects in response to inconsequential information only to find the new information outdated by the time a decision is made." (citation and quotation marks omitted)).[6]

**Fifth**, Plaintiff asserts that a SEIS is required because I-73 will induce widespread regional development. (ECF No. 81-1 at 30.) However, the potentiality of increased development is not new information; in fact, it was one of the primary motivations for the I-73 project. (FHWA0024706, FHWA0030468.) Furthermore, FHWA already analyzed I-73's expected development impacts. As to I-73 South, FHWA analyzed expected land use changes and concluded that the Preferred Alternative was "estimated to result in roughly 13 percent of additional new growth" beyond already expected growth. (FHWA0024831–36, FHWA0024895–96.) Similarly, in the I-73 North FEIS, FHWA determined that the project was expected to induce at total of 1,068.50 acres of development. (FHWA0030582.) This additional development was identified as a 124.87 percent increase from the no-build condition. (FHWA0030583, FHWA0030577–86; *see also* FHWA0030469 (explaining that the project would improve opportunities for economic development, attract new businesses and industries to the area, and stimulate the development of services near the interstate corridor).) Because the potential for induced

---

[6] Plaintiff also bases its claim for an updated Section 4(f) analysis on these purportedly significant changes in noise and air impacts. However, Plaintiff points to no new information addressing any specific Section 4(f) resource. Plaintiff's discussion of its Section 4(f) claim is confined to a footnote alleging, without citation to the record, that "I-73's impacts to Section 4(f) resources including noise, vibration, air quality, and other related impacts have increased dramatically since the agency's original 4(f) analysis was conducted as part of the original NEPA process." (ECF No. 81-1 at 29–30 n.11.) However, FHWA's Reevaluations considered whether there have been any changes to affected Section 4(f) resources, of which there are two. (*See supra* at 10.) In both cases, the answer was no. (*Id.* at n.4.) For both I-73 North and South, the only additional noise impacts were to residential properties, not Section 4(f) resources. (*See supra* at 22–23.) Further, the only Section 4(f) resource impacted by I-73 North was a historic building that is planned to be demolished. (FHWA0031187–88, FHWA0035337.) It goes without saying that an increase in noise, vibration, or air pollution would have no greater effect on a building than demolition. As to I-73 South, the potential for increased impacts to the Little Pee Dee Historic Preserve was thoroughly evaluated. (*See* FHWA0053176, FHWA0053181–82.)

development was discussed in the FEISs, supplementation is not required. *Weinberger*, 745 F.2d at 418 (stating that the "principal factor" in determining whether supplementation is required is "the extent to which the new information presents a picture of the likely environmental consequences associated with the proposed action not envisioned by the original EIS").

In summary, Plaintiff fails to identify any substantial project changes or significant new information. Thus, FHWA and the Corps reasonably concluded that a SEIS was not required and Defendants' motions for summary judgment are granted as to Plaintiff's NEPA claims.

**II. Clean Water Act Compliance**

Plaintiff asserts that the Corps violated the CWA in two overarching ways: (1) by accepting without independent evaluation FHWA's alternatives analysis in the FEISs, and (2) by failing to presume the availability of practicable alternatives to I-73. (ECF No. 81-1 at 31–40.) The Court finds that statutes and regulations, the weight of judicial authority, and the administrative record demonstrate otherwise.

By way of statutory and regulatory background, the objective of the CWA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The CWA prohibits the unauthorized discharge of pollutants in the "navigable waters," including wetlands, of the United States. *Id*. § 1311(a). Section 404(a) of the CWA authorizes the Secretary of the Army, acting through the Corps, to issue permits for the discharge of dredged and fill material into navigable waters "after notice and opportunity for public hearings." *Id.* § 1344(a). In order to issue a permit, the Corps must comply with EPA regulations under the CWA, *id.* § 1344(b)(1), commonly

known as the Section 404(b)(1) Guidelines ("Guidelines"), 40 C.F.R. § 230.10. The Guidelines require that a discharge into wetlands will not cause significant adverse effects on human health/welfare, aquatic life, or the aquatic ecosystem. *Id.* § 230.10(c)(1)-(3). Furthermore, the Guidelines prohibit the Corps from granting a permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." *Id.* § 230.10(a).

The Guidelines lay out a framework for determining whether an alternative to the proposed discharge site is practicable. An alternative is practicable "if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). Discharge into a "special aquatic site" is a key factor under the Corps' permit analysis. *Id.* § 230.10(a)(3). If a proposed permit is seeking to discharge into a special aquatic site, such as wetlands, the Corps will undertake a two-step analysis in determining whether to grant the permit. The Corps will first define the "basic purpose" of the project under 40 C.F.R. § 230.10(a)(3). *City Club of N.Y. v. U.S. Army Corps of Eng'rs*, 246 F. Supp. 3d 860, 865 (S.D.N.Y. 2017). Next, the Corps will determine if that basic purpose is "water dependent." *Id.* A basic purpose is not water dependent where the project "does not require access or proximity to or siting within the special aquatic site in question[.]" 40 C.F.R. § 230.10(a)(3). The Guidelines state that when a project is not water-dependent, "practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." *Id.* § 230.10(a)(3).

As the Fourth Circuit has explained, "both the Corps and the EPA are responsible

for the issuance of permits under the CWA and enforcement of their terms," but "[t]he EPA is ultimately responsible for the protection of wetlands." *Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313, 315–16 (4th Cir. 1988). Under Section 404(c) of the CWA, 33 U.S.C. § 1344(c), the EPA has veto power over any decision of the Corps to issue a permit. EPA may exercise this statutory "veto" authority either before or after a Section 404 permit has been issued. *See, e.g.*, *Mingo Logan Coal Co. v. EPA*, 714 F.3d 608, 609, 613-14 (D.C. Cir. 2013).

The Court will now turn to the question of the Corps' CWA compliance in this case. **First**, the Corps' reliance on FHWA's NEPA analysis was consistent with governing law and longstanding guidance. For highway projects like I-73, Congress has directed federal agencies, "to the maximum extent practicable," to base "all Federal permits and reviews"—including Section 404 permits—on "a single" NEPA document. 23 U.S.C. § 139(d)(8)(A). Similarly, the Section 404(b)(1) Guidelines state that "the analysis of alternatives required for NEPA environmental documents . . . will in most cases provide the information for the evaluation of alternatives under these Guidelines." 40 C.F.R. § 230.10(a)(4).[7] The Corps' Regulatory Standard Operating Procedures likewise provide that the Corps, as a general matter, "should not conduct or document separate alternatives analyses for NEPA and the 404(b)(1) Guidelines." (CORPS0002715.)

Moreover, the Corps' actions with respect to the alternatives analysis were consistent with decisions by the First and Seventh Circuits and by multiple district courts in the Fourth Circuit, all of which have affirmed the Corps' reliance on another agency's

---

[7] As EPA noted in the preamble to the Section 404(b)(1) Guidelines, "where an adequate alternatives analysis has already been developed, it would be wasteful not to incorporate it into the 404 process." Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 45 Fed. Reg. 85,336, 85,340 (Dec. 24, 1980).

NEPA analysis in similar circumstances. *See, e.g.*, *Hoosier Envtl. Council v. United States Army Corps of Eng'rs*, 722 F.3d 1053, 1061 (7th Cir. 2013) ("*Hoosier*"); *Town of Norfolk v. United States Army Corps of Eng'rs*, 968 F.2d 1438, 1447–48 (1st Cir. 1992); *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. United States Dep't of Transp.*, 524 F. Supp. 2d 642, 686–89 (D. Md. 2007) ("*Audubon*"); *Alliance for Legal Action v. United States Army Corps of Eng'rs*, 314 F. Supp. 2d 534, 551–52 (M.D.N.C. 2004). Two of those decisions bear a close resemblance to the instant matter. *Hoosier* and *Audubon* both concerned challenges to Section 404 permits issued by the Corps for highway projects. There, as here, FHWA developed the FEISs with input from the Corps. *Hoosier*, 722 F.3d at 1060; *Audubon*, 524 F. Supp. 2d at 687. And there, as here, the Corps relied on FHWA's NEPA record to inform its LEDPA determination. 722 F.3d at 1060–61; 524 F. Supp. 2d at 689. In upholding the Corps' permitting decision, the *Audubon* court stated, "The Corps' reliance on the FHWA and its decisions is encouraged and even permitted under the regulations, primarily to channel resources and to eliminate needless duplication." 524 F. Supp. at 687. Similarly, in *Hoosier* the Seventh Circuit held that the Corps "isn't required to reinvent the wheel. If another agency has conducted a responsible analysis the Corps can rely on it in making its own decision." 722 F.3d at 1061.

Nevertheless, Plaintiff argues the Corps failed a duty to "demonstrate . . . independent review on this issue" (ECF No. 81-1 at 34) by "simply copy[ing] the project purpose statement from the NEPA documents" (*id.* at 20), "deferr[ing] to SCDOT and FHWA in finding I-73 to be the [LEDPA]" (*id.*), and/or "[a]t most . . . summariz[ing] SCDOT and FHWA's alternatives development and selection process" (*id.* at 26 n.13). The Fourth Circuit has rejected this "independent review" argument in the past and the Court finds it

unpersuasive here. *Crutchfield v. County of Hanover* concerned a challenge to a Section 404 permit that the Corps issued based in part on a study submitted by the project applicant. 325 F.3d 211, 223 (4th Cir. 2003). The district court upheld the challenge, concluding—along the lines urged by Plaintiff—that the Corps "had a responsibility to independently investigate" the applicant's studies, *id.*, and was thus obliged to document its "independent calculations" in the record, *id.* at 224 n.5. The Fourth Circuit reversed, stating, "For us to require the Corps to do such independent studies rather than reasonably relying on extensive studies given to them . . . would place unreasonable and unsuitable responsibilities on the Corps . . . ." *Id.* at 223 (citation and quotation marks omitted). The *Crutchfield* court further stated, "Critically, . . . the administrative record *does* include the figures on which [the Corps'] conclusions were based. This suffices[.]" *Id.* at 224 n.5 (emphasis in original). The same is true here. The Corps clearly explained how it reached its LEDPA determination based on the NEPA alternatives analysis that was included in its record. (CORPS0034461–76.) In so doing, it demonstrated "a rational connection between its decision-making process and its ultimate decision." *Crutchfield*, 325 F.3d at 218 (citation and quotation marks omitted).

Plaintiff's "independent analysis" argument also fails because the record belies the Plaintiff's contention that the Corps "blindly accepted" FHWA's NEPA analysis. (*See* ECF No. 81-1 at 31.) Rather, the Corps played an active role in shaping the NEPA review as both a cooperating agency and a member of the ACT. (CORPS0004802–03.) In those capacities, the Corps attended roughly three dozen meetings from mid-2004 through 2007,[8] during which it and the other ACT members reviewed and critiqued multiple draft

---

[8] The Corps attended thirty-one gatherings of the full ACT or sub-committees thereof (CORPS0004825–26, CORPS0004846), held at least two separate meetings with FHWA and SCDOT (CORPS0004827,

statements of project purpose and need (FHWA000411, FHWA000530, FHWA0001442, FHWA0001869), discussed and approved FHWA and SCDOT's proposed use of the CAT (FHWA0000413, FHWA0000432, FHWA0001813, FHWA0001856, FHWA0001868–69), and debated and voted on potential alternative alignments (FHWA0001629-36, FHWA0013643–48)—the very things that Plaintiff now alleges the Corps accepted without scrutiny.

The record also makes clear that the Corps was not a passive participant. During early stages of the NEPA review, for example, it advised FHWA and SCDOT on how to screen for wetlands. (CORPS0004826.) A short time later, the Corps met separately with FHWA and SCDOT to review their proposed method for identifying the wetland impacts of potential project routes. (CORPS0004827.) Then, over the course of the next two years, the Corps conducted three multi-day field visits: two with the ACT as a whole, and one with SCDOT and FHWA separately. (FHWA0001477, FHWA0013944, CORPS0004836.) That latter visit focused on specific "areas of concern," where wetland boundaries were uncertain. (CORPS0004836.) Based on the Corps' field observations, FHWA and SCDOT augmented their estimates of wetland impacts, but the Corps confirmed that FHWA and SCDOT's overall approach to wetland verification "was sound." (*Id.*)

Where the Corps sought changes, it made its position known. During ACT meetings, the Corps repeatedly voted against alternatives favored by the transportation agencies. (*See, e.g.*, FHWA0001630–32, FHWA0001635, FHWA0001764.) The Corps

---

FHWA00013968), and conducted a site assessment that was separate from the field visits by the ACT as a whole (FHWA0002138, CORPS0004836). Photographs, sign-in sheets, and minutes in the record demonstrate that each of these meetings spanned several hours or, in some cases, several days, and that a representative from the Corps attended in person.

also insisted that a previously eliminated alternative be reinstated and studied in greater detail. (FHWA0001863–65.) It secured modifications to the I-73 South EIS to make that document suitable for use in any eventual Section 404 permitting process. (FHWA0013968–69; *see also* FHWA0013976 (noting FHWA's commitment to "work with the [Corps] to write the FEIS together so that both agencies can use it").) All of this is consistent with the Corps' assertion in the ROD, that it independently reviewed the NEPA record and concluded that its "comments and suggestions" on the EISs were "satisfied." (CORPS0034449.) Accordingly, the Court finds that the record refutes Plaintiff's portrayal of the Corps' CWA permitting process as a mere rubberstamp.

**Second**, the fact that the Corps declined to adopt Plaintiff's criticisms of FHWA and SCDOT's NEPA analysis and SCDOT's Section 404 permit application does not mean that the Corps failed to independently review the NEPA record. Plaintiff claims that the Corps erred by basing its statement of "overall project purpose" on the "overly narrow" statement of project purpose and need that was in the FEISs and in SCDOT's Section 404 permit application. (ECF No. 81-1 at 31 n.12.) However, in defining a project's overall purpose, "the Corps has a duty to consider the applicant's purpose and the objectives of the applicant's project. Indeed, it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable." *Friends of Santa Clara River v. United States Army Corps of Eng'rs*, 887 F.3d 906, 912 (9th Cir. 2018) (citations and quotation marks omitted). Moreover, in the transportation planning context, the Council on Environmental Quality has directed the Corps to "afford substantial deference to the DOT agency's [(here, FHWA's)] articulation of purpose and need." (CORPS0000013.) The Corps has embedded that guidance in its own Standard

Operating Procedures. (CORPS0002711.) Thus, while the Corps is ultimately responsible for determining a project's overall purpose, it does not start from scratch. As the Corps explained in the EA, it must "balance[] the need to conduct an independent review" of the proposed project purpose "with the need to recognize FHWA's role . . . as the expert federal agency responsible for Transportation decisions," while also "consider[ing] the applicants' needs and the type of project being proposed." (CORPS0034357–58.)

Because the Corps does not write statements of overall project purpose on a blank slate, the question is not whether the Corps might articulate a "more appropriate" purpose, as Plaintiff suggests. (ECF No. 81-1 at 31 n.12.) Rather, the relevant inquiry is whether a statement of project purpose is "merely . . . a pretense for excluding other alternatives or artificially constraining the Corps' alternatives analysis." *Great Rivers Habitat All. v. United States Army Corps of Eng'rs*, 437 F. Supp. 2d 1019, 1027 (E.D. Mo. 2006). "If the applicant's purpose is legitimate, then the Corps is not entitled to reject the purpose and substitute for it one it deems more appropriate." *All. For Legal Action*, 314 F. Supp. 2d at 549 (citation omitted). FHWA and SCDOT defined I-73, in relevant part, as an "interstate link" between the I-73/I-74 Corridor in North Carolina and the Myrtle Beach region in South Carolina. Plaintiff would have the Corps strike the word "interstate" in order to expand the range of viable alternatives, but its inclusion was no mere pretense and the Court finds that the Corps did not act in an arbitrary or capricious manner by incorporating it.

FHWA and SCDOT explained at length that they defined I-73 as an "interstate" link after concluding, based on their review of a series of laws, that Congress intended an *interstate* highway. (*See, e.g.*, FHWA0052707–08 (responding to Plaintiff's comments), FHWA0024701–02 (explaining the project's purpose in the FEIS).) That conclusion was

sound as a matter of statutory interpretation. "Interstate" is a term of art, defined by Congress to mean a system of roads designed to standards established in FHWA-issued regulations. 23 U.S.C. §§ 101(12), 103(c), 109(b). Congress's references to "I-73 from Myrtle Beach, SC to I-95, ending at the North Carolina State line" and to "Interstate 73 from NC line to Myrtle Beach, SC," must be read in light of that definition. SAFETEA-LU §§ 1301, 1702. Those references must also be viewed against the broader legislative backdrop: for 15 years, across multiple major transportation bills (*see supra* at 3–4), Congress sought to create a new interstate corridor because parts of the nation—including Myrtle Beach and its environs—are "not now adequately served by the Interstate System or comparable highways." ISTEA § 1105. Thus, considerations of text and context both lead to the same conclusion: when Congress said to "plan and build Interstate 73" in South Carolina, SAFETEA-LU § 1702, it meant an *interstate* highway. The fact that other states, as Plaintiff notes (*see* ECF No. 81-1 at 13, 16 n.2), have thus far elected not to build out their portions of the I-73 corridor is immaterial. No state is required under federal law to undertake a given transportation project. 23 U.S.C. § 145(a). But where, as here, a state elects to do so using federal highway aid, congressional intent matters.

It was proper, moreover, for FHWA to reflect Congress's clearly articulated policy preference in I-73's project purpose statement. Congress itself has endorsed that approach, expressly allowing agencies to define transportation projects by reference to "national objectives, as established in Federal laws, plans, or policies." 23 U.S.C. § 139(f)(3)(C). Courts have long recognized that an agency "should always consider the views of Congress, expressed . . . in the agency's statutory authorization to act, as well as in other congressional directives" when defining a project's purpose. *Citizens Against*

*Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) (Thomas, J.). As a pertinent example, one court has upheld as reasonable FHWA's reliance on congressional intent favoring an *interstate* design to define the purpose of Virginia's stretch of I-73. *Virginians for Appropriate Roads v. Capka*, No. CIV.A. 7:07CV00587, 2009 WL 2160454, at *3 (W.D. Va. July 20, 2009).

All of this goes to the reasonableness of FHWA and SCDOT's project purpose statement, which is only indirectly relevant here. As explained above, if Plaintiff wanted to directly challenge FHWA and SCDOT's formulation, it could have sued within the applicable six-year statute of limitations. *See supra* at 14–15. It did not. So the question at issue, it bears repeating, is not whether FHWA and SCDOT's project purpose statement was reasonable in the first instance, but whether the Corps clearly erred in not rejecting that statement as a mere pretense. Even if the first question were a close call, which it is not, the answer to the second would still be clear: the Corps could not reasonably dismiss as illegitimate FHWA and SCDOT's deference to congressional intent. Therefore, the Corps could not reasonably reject FHWA and SCDOT's formulation of project purpose as a mere pretense to evade environmental review.

Plaintiff's remaining criticisms premised on an alleged lack of independent review are connected to its general theory that FHWA and SCDOT overstated the environmental impacts of upgrading existing roadways and that the Corps erred in accepting a contrived alternatives analysis that was skewed to favor an interstate on a new alignment. (*See* ECF No. 81-1 at 32–34.) Plaintiff argues that FHWA and SCDOT "arbitrarily favored a new-build interstate" by using NWI data "instead of site-specific analysis" to assess potential corridors. (*Id.* at 17.) However, FHWA, SCDOT, and the other members of the

35

ACT used not just NWI data but also infrared imagery, soil and topographical maps, and multiple field studies to identify and map wetland impacts. (FHWA0053244, FHWA0038125.) NWI data was used on its own only at the outset of the NEPA process, and then only to winnow the field of CAT-generated corridors from hundreds to dozens. (CORPS0034384.) The Agencies rightly note that this was an essential first step in the analysis given the size of the 2,255 square mile study. (ECF No. 83-1 at 42; FHWA0000642; see also FHWA0003175 (noting the precise size of the study area).) As FHWA and SCDOT explained, "NWI data, while not perfect," was "the best tool available to evaluate wetlands on such a scale." (FHWA0000642.) That tool was also used uniformly to assess all preliminary alternatives. (FHWA0024739.) Thus, even if the NWI dataset "inflated" wetland impacts, as Plaintiff claims (ECF No. 81-1 at 26), then it did so across the board, not just for corridors that tracked existing roadbeds. There is no evidence to support Plaintiff's claim that the use of NWI data was arbitrary or that it favored a new-build interstate.

Plaintiff further argues FHWA and SCDOT "arbitrarily favored a new-build interstate" by using 600-foot corridor widths to assess wetland impacts of preliminary alignment alternatives. (Id. at 17, 26.) Again, the same corridor width was used to evaluate all preliminary alignments. (FHWA0024739.) If a 600-foot corridor overstated the wetland impacts of a route that followed existing roads, then it also overstated the wetland impacts of a route that did not. Thus, nothing about corridor width favored a new-build interstate over one that followed existing roads.

There was nothing exceptional or improper about FHWA and SCDOT's use of a 600-foot corridor. As FHWA explained, the project's design "had not been established

when the preliminary Build Alternatives were developed by the CAT program" so the agencies used a conservative 600-foot corridor since that was an "adequate width to accommodate" any eventual road design. (FHWA0053220.) When it was possible to do so during later stages of review, FHWA and SCDOT used design-based rights of way to assess a final group of reasonable alternative alignments. (FHWA0024743–47.) Among that group were routes that tracked long stretches of U.S. 501, Plaintiff's preferred corridor. (*See* FHWA0024752, FHWA0024755, FHWA024759 (maps showing Reasonable Build Alternatives 1, 4, and 8).)[9] Every Reasonable Build Alternative incorporated all or nearly all of S.C. 22. (FHWA0024707, FHWA0052722.) Thus, Plaintiff's claim that FHWA and SCDOT "refused to consider upgrading existing roads" (ECF No. 81-1 at 8) is refuted by the record.

Plaintiff critiques FHWA and SCDOT's affirmation that upgrade alternatives were adequately considered, arguing, "in reality, 'each of the preliminary alternatives considered included *significant deviations* from the existing highway corridor, thereby artificially altering the number of wetland and aquatic stream impacts.'" (*Id.* at 17 (quoting FHWA0054793).) The insinuation is that those deviations were arbitrary. The Court finds that they were not. FHWA and SCDOT used the CAT to generate preliminary alternatives that minimized impacts to the natural and built environment. The CAT's output was a function of its dozens of GIS layers and of the numeric values that the ACT assigned to features in those layers. (FHWA0024733–40; *see also* FHWA0003187–91 (Data Collection Technical Memorandum).) The ACT assigned the lowest impact score to

---

[9] Color reproductions of the maps in the I-73 South FEIS are available at:
http://www.i73insc.com/download/impactstudy_southern/Chapter-2-Part-3.pdf and
http://www.i73insc.com/download/impactstudy_southern/Chapter-2-Part-4.pdf.

arterial routes, thereby pushing the program to *favor* alignments along existing roads, all other factors being constant. (*See supra* at 6–8.) Multiple preliminary and final alternatives tracked stretches of U.S. 501, among other existing routes. (FHWA0052720.) But roads inevitably pass through towns (*see id.*),[10] so the CAT's algorithm caused it to stray from existing corridors in order to avoid "constraints" like cemeteries and schools and to minimize impacts on businesses, houses, churches, and fire stations. (FHWA0024734–35.) These observations about the thoroughness of the FHWA and SCDOT alternatives analysis go to show that the Corps did not fail its duty to conduct an independent review simply because it deferred to the expert judgment of the transportation agencies. In summary, Plaintiff has made no showing of arbitrary or capricious conduct by the Corps with respect to the independent nature of its review in the CWA permitting process.

**Third**, despite Plaintiff's protestations to the contrary, the Court finds that the Corps reasonably determined that SCDOT's proposed project was the LEDPA. Because the Corps determined that I-73 was not "water dependent," SCDOT had to "clearly demonstrate[]" that its proposed project was the LEDPA in order to successfully obtain the Section 404 permit. 40 C.F.R. § 230.10(a)(3). The Corps found that SCDOT did so. This Court's inquiry is whether the Corps' finding "was a clear error of judgment." *Alliance for Legal Action*, 314 F. Supp. 2d at 543 (stating that in evaluating a challenged LEDPA determination "the court's inquiry is not whether the Corps has clearly demonstrated a lack of practicable alternatives, but whether its decision that [the applicant] had done so was a clear error of judgment"). So long as the Corps explained itself by drawing a "rational connection between the facts found and the choice made, the agency's decision

---

[10] For example, U.S. 501 bisects Aynor, South Carolina, and S.C. 9 is Main Street in both Dillon and Nichols respectively.

is entitled to deference." *Id.* at 544 (citations and quotation marks omitted). The Court finds that the Corps' actions here meet that test.

FHWA and SCDOT used the CAT to create hundreds of potential alignments, which they discussed with the ACT. (CORPS0034460–61.) They then selected for further analysis feasible corridors with the fewest environmental impacts. (CORPS0034461.) FHWA and SCDOT, with input from the ACT and the public, eventually settled on eleven Reasonable Build Alternatives—eight for I-73 South and three for I-73 North. (*Id.*) From this field, FHWA and SCDOT chose the two routes with the "least amount of wetland impacts." (CORPS0034465, CORPS0034472.) Based on that process and ultimate result, the Corps found that SCDOT had "met its burden" by rebutting the Section 404(b)(1) Guidelines' presumption regarding practicable alternatives. (CORPS0034476.) All of this was clearly and concisely set forth in the Corps' ROD (CORPS0034460–76) and supported by a voluminous record.

Plaintiff contests the reasonableness of the Corps' conclusion because the Smart Mobility Report, Aerial Photo Report, and Miley Report posit additional alternatives. (ECF No. 81-1 at 35–38.) In Plaintiff's view, the Corps did not adequately "grapple with" those alternatives, thereby demonstrating a failure to presume the existence of less damaging practicable alternatives. (*Id.* at 39.) According to the Smart Mobility Report, South Carolina should rethink its (and Congress's) plan to build an interstate and should instead consider building a "Grand Strand Expressway." (FHWA0036873.) However, an alternative is "practicable" only if it is "capable of being done . . . in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). As FHWA explained when the Corps sought its comment on the Smart Mobility report, a non-interstate expressway would not meet I-73's

purpose of creating an "interstate link" to Myrtle Beach. (*See* FHWA0037182 (letter from the Corps to FHWA dated August 9, 2012), CORPS0007966 (FHWA's response, dated September 4, 2012).) For reasons already discussed at length, the Corps could not reasonably dismiss that purpose as an illegitimate pretense and so had no basis to ignore it. (*See supra* at 32–35.) A non-interstate expressway, then, was beyond the scope of the Corps' LEDPA analysis.

In any event, as SCDOT noted in both its permit application and its response to comments (incorporated by reference in the Corps' EA), there is no discernible difference between the Smart Mobility Report's favored expressway alternative and the "no-build" alternative that was reviewed at length and rejected in the NEPA record. (*See* CORPS0016115, CORPS0016121–23 (permit application); *see also* FHWA0052723, FHWA0052727–29 (response to comments).) It is no wonder that the Smart Mobility Report found a Grand Strand Expressway that followed S.C. 38 and U.S. 501 would "have by far the lowest cost and environmental impact" of any route, because the Report also noted the corridor is already "essentially an expressway in its current configuration." (FHWA0036881.) But FHWA and SCDOT reviewed that "current configuration" as part of the No-Build Alternative and concluded in the I-73 South FEIS, that S.C. 38 and U.S. 501 were inadequate to meet projected transportation demand or serve the hurricane evacuation needs of the region. (CORPS0016121–23, CORPS0034399.) The Smart Mobility Report does not say how, or even if, the Grand Strand Expressway would differ from the status quo. (*See* FHWA0036881 ("Further study of [the S.C. 38/U.S. 501] corridor is needed to determine if additional improvements would be appropriate[.]").) Thus, it offers no reason to conclude that FHWA and SCDOT's assessment of the No-

Build Alternative would not apply with equal force to the same roads rebranded as a "Grand Strand Expressway."

The Aerial Photo Report imagines an expressway that traces the path of the existing S.C. 38/U.S. 501 expressway and concludes that this hypothetical expressway-on-an-expressway would have fewer wetland impacts than I-73. (FHWA0037022.) The Report does not explain how such a road would satisfy I-73's project purpose and how it would improve traffic flow relative to existing conditions, questions that bear directly on an alternative's practicability for purposes of the LEDPA analysis. As to the Aerial Photo Report's claim that an interstate following S.C. 38 and U.S. 501 would have fewer wetland impacts than SCDOT's proposed route, it suffers from the fundamental flaw that it assumes the feasibility of an S.C. 38/U.S. 501 alignment without accounting for the obvious impracticability of, for example, constructing an interstate directly through small towns like Aynor. By contrast, FHWA and SCDOT balanced such considerations when delineating reasonable alternative alignments. (*See supra* at 6–9; *see also, e.g.*, FHWA0052721–22 (noting displacement of local businesses that would result from upgrades to S.C. 38's interchange with I-95), CORPS0034396-97 (noting other route modifications to avoid impacts to businesses and infrastructure).) To accept an S.C. 38/U.S. 501 interstate as a practicable alternative on the basis of the Aerial Photo Report would have required the Corps to favor the modeling assumptions of an "Imagery Analyst" (FHWA0037037) over the wholistic opinions of expert transportation agencies vetted through various rounds of review and revision. The Court finds that the Corps acted reasonably and appropriately in opting not to do so.

As to the Miley Report, Plaintiff argues that an "upgrad[ed]" S.C. 38/U.S. 501

expressway is "clearly practicable" because its cost-benefit ratio is better than that of the proposed interstate. (ECF No. 81-1 at 37.) However, the Miley Report's assumption about the upgraded expressway's costs rests entirely on the Smart Mobility Report, which does not address what upgrades to existing roads would be necessary or feasible and so provides no basis for reliable estimates of project cost. (*See* FHWA0036992, FHWA0037004, FHWA0037012 (attributing cost estimates to the Smart Mobility Report).) In contrast, cost estimates for I-73 "were based on site specific engineering." (CORPS0016104.) Thus, as SCDOT noted in its permit application to the Corps, "the two estimates are not equivalent" and "any comparison between them is flawed." (*Id.*)

In conclusion, neither Plaintiff's reliance the Smart Mobility Report, Aerial Photo Report, and Miley Report, nor its other arguments regarding the Corps' LEDPA analysis are sufficient to show that the Corps made a clear error of judgment when it determined that SCDOT clearly demonstrated a lack of practicable alternatives. *See Alliance for Legal Action*, 314 F. Supp. 2d at 543. Accordingly, Defendants' motions for summary judgment are granted as to Plaintiff's CWA claims.

### III. EPA's Veto Power Over The Section 404 Permit

Plaintiff's claim against EPA is derivative of its claim against the Corps. The Court has determined that the Corps acted reasonably in issuing the Section 404 permit to SCDOT. (*See supra* at 26–42.) It follows that EPA properly declined to exercise its discretionary authority under 33 U.S.C. § 1344(c) to veto the Corps' issuance of the permit. Further discussion of EPA's supposed improper motives in declining to exercise its discretion (*see* ECF No. 81-1 at 42–44) would be superfluous. Accordingly, the Court grants Defendants' motions for summary judgment as to Plaintiff's claim against EPA.

42

## **<u>CONCLUSION</u>**

For the reasons set forth above, Plaintiff South Carolina Coastal Conservation League's motion for summary judgment (ECF No. 81) is DENIED; Defendants United States Army Corps of Engineers, Charleston District, United States Environmental Protection Agency, and United States Department of Transportation, Federal Highway Administration's cross-motion for summary judgment (ECF No. 83) and Defendant Christy Hall, Secretary of the South Carolina Department of Transportation's cross-motion for summary judgment (ECF No. 84) are GRANTED. This action is DISMISSED.

**IT IS SO ORDERED.**

<u>/s/Bruce Howe Hendricks</u>
United States District Judge

September 2, 2021
Charleston, South Carolina